**LONE STAR INDUSTRIES, INC.,**
**Plaintiff-Appellant**

v.

**Charles REDWINE, as Trustee of the OKC Corporation Liquidating Trust; Charles Redwine, individually; OKC Limited Partnership; Cloyce K. Box; and CKB & Associates, Inc., Defendants-Appellees.**

No. 84–3470.

United States Court of Appeals,
Fifth Circuit.

April 22, 1985.

Wilkinson & Wilkinson, John B. Wilkinson, New Orleans, La., Steven J. Rothschild, Skadden, Arps, Slate, Wilmington, for plaintiff-appellant.

Brice & Barron, John P. Lilly, Jim K. Choate, Dallas, Tex., for Redwine.

Before RUBIN, HILL, Circuit Judges, and HINOJOSA,* District Judge.

ROBERT MADDEN HILL, Circuit Judge:

Lone Star Industries, Inc. (Lone Star) brought this diversity action against Charles Redwine, as Trustee of OKC Corporation Liquidating Trust (the Trust); the

---

* District Judge of the Southern District of Texas, sitting by designation.

OKC Limited Partnership; Cloyce K. Box (Box), individually; and CKB & Associates, Inc. The district court dismissed, 590 F.Supp. 547, holding that the OKC Corporation (OKC), a non-diverse party, was an indispensable party to Lone Star's action against all defendants. We reverse.

## I.

OKC was a Delaware corporation with its principal place of business in Texas. On May 13, 1980, the shareholders of OKC adopted a plan of liquidation. The plan called for the complete liquidation and distribution of OKC's assets within the year, i.e., by May 12, 1981. The plan excepted from distribution those assets reasonably necessary to provide for payment of OKC's liabilities on the expenses of liquidation. If the distribution could not be completed within the year, the plan called for transfer of the remaining assets and liabilities to a trust created for the benefit of OKC's stockholders. On September 13, 1980, Lone Star purchased OKC's cement manufacturing plant in New Orleans, Louisiana. As part of the purchase agreement, OKC agreed to complete a dock facility under construction at the New Orleans plant. The agreement further required that construction be completed by March 31, 1981. On April 1, 1981, Lone Star sent a notice of default to OKC.

On May 5, 1981, anticipating that not all of OKC's assets would be distributed by May 12, the OKC Board of Directors adopted a resolution establishing the Trust proposed in the plan of liquidation and appointing Charles Redwine trustee. In the same resolution the Board approved transfer of OKC's assets and liabilities to the Trust.

On May 11, 1981, OKC filed its certificate of dissolution with the Secretary of State of Delaware. On the same day, the certificate and articles of incorporation of OKC Limited Partnership were filed in Texas. The articles named Cloyce Box and CKB & Associates, Inc. as general partners and OKC as a limited partner.[1] OKC contributed substantial oil and gas interests to the partnership. OKC then distributed its limited partnership interest among its shareholders as a liquidating distribution. On May 12, 1981, OKC formally executed the Liquidating Trust Agreement (the Trust Agreement) pursuant to the May 5 resolution. The Trust Agreement provided that the Trustee assume all of OKC's liabilities and claims. On November 9, 1981, construction of the dock facility was finally completed.

In June 1982, Lone Star filed this action against Redwine, as trustee of the Liquidating Trust, seeking damages for breach of the dock construction agreement. In September 1983, upon learning of the insolvency of the Trust, Lone Star added as defendants, Redwine, in his individual capacity, the OKC Limited Partnership, Cloyce Box and CKB & Associates, Inc., seeking recovery of assets allegedly wrongfully transferred from OKC to the three added defendants.

On June 12, 1984, the district court granted the defendants' motion to dismiss on alternative theories, viz., failure to join a party needed for just adjudication, and failure to state a claim on which relief may be granted.

## II.

On its own motion, the district court dismissed the action against the Trust because of the failure to join OKC, it being "regarded as indispensable" under Fed.R. Civ.P. 19(b).[2] OKC could not feasibly be

---

1. Box, who was general partner of the OKC Limited Partnership and also principal shareholder of CKB & Associates, Inc., served as chairman of the board of OKC as well as being a substantial shareholder of OKC.

2. Fed.R.Civ.P. 19 provides, in part:
   (a) Persons to be Joined if Feasible. A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a

joined under Rule 19(a) because joinder would destroy diversity, both OKC and Lone Star being Delaware corporations. *See supra* note 2. All defendants agree with Lone Star that the court erred in dismissing the action on this theory. The court's holding rested on a single foundation: the invalidity of the Trust's assumption of OKC's liabilities (which included performance of the construction contract) pursuant to the Trust Agreement. Despite this, we are of the opinion that OKC could not have been indispensable. We therefore join the parties in the conclusion that dismissal was improper.

### A.

■ Regardless of the validity of the creation of the Trust itself and that of the

assignment of OKC's obligations under the dock facility construction contract, which we discuss below, OKC could not have been indispensable to this action. One fact is critical: in May 1984, one month before the district court ruled, OKC ceased to exist as a legal entity. Under Del.Code Ann. tit. 8, § 278 (1983),[3] a corporation's legal existence is continued for three years, and only three years, after dissolution unless extended by order of court.[4] OKC filed its dissolution in May 1981 and, consequently, expired by operation of law in May 1984. Further, by this date OKC had also disposed of virtually all of its assets.

■ In light of OKC's expiration, it is clear that it could not have been indispensable under Fed.R.Civ.P. 19(b).[5] Nothing

---

practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of his claimed interest.

   (b) Determination by Court Whenever Joinder not Feasible. If a person as described in subdivision (a)(1)–(2) hereof cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable. The factors to be considered by the court include: first, to what extent a judgment rendered in the person's absence might be prejudicial to him or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

3. While indispensability is an issue determined by federal law, state law will define the substantive rights of the parties and the interests concerned. *Provident Bank & Trust Co. v. Patterson*, 390 U.S. 102, 124 n. 22, 88 S.Ct. 733, 745 n. 22, 19 L.Ed.2d 936 (1968); *Boone v. General Motors Acceptance Corp.*, 682 F.2d 552, 553 (5th Cir.1982). Under *Klaxon v. Stentor Elec. Mfr. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), we are required to apply the law of the state in which the district court sits, even to the extent of applying that state's choice of law principles. *Day & Zimmerman, Inc. v. Challoner*, 423 U.S. 3, 96 S.Ct. 167, 46 L.Ed.2d 3 (1975) (per curiam). This entails a determination of

state law as we believe the highest court in the state would view it. *See, e.g., Walker v. Savell*, 335 F.2d 536, 540–41 (5th Cir.1964); *McKenna v. Ortho Pharmaceutical Corp.*, 622 F.2d 657, 662–63 (3rd Cir.), *cert. denied*, 449 U.S. 976, 101 S.Ct. 387, 66 L.Ed.2d 237 (1980). Although the Louisiana courts have not ruled on the precise issue, we think they would apply the law of the state of incorporation in determining the viability of a corporation after dissolution. *See Quickick, Inc., v. Quickick Int'l*, 304 So.2d 402, 406–07 (La.App.), *writs denied*, 305 So.2d 123 (1974) (law of state of incorporation applied to determine whether individual was alter ego of corporation); *Jagers v. Royal Indemnity Co.*, 276 So.2d 309 (La.1973) (interest analysis).

4. Section 278 provides, in part:

   All corporations, whether they expire by their own limitations or are otherwise dissolved shall nevertheless be continued, for the term of 3 years from such expiration or dissolution or for such longer period as the Court of Chancery shall in its discretion direct, bodies corporate for the purpose of prosecuting and defending suits, whether civil, criminal or administrative, by or against them, and of enabling them gradually to settle and close their business, to dispose of and convey their property, to discharge their liabilities and to distribute to their stockholders any remaining assets, but not for the purpose of continuing the business for which the corporation was organized.

All subsequent references to title 8 of the Delaware Code are to the 1983 revision.

5. In fact, it appears that Delaware law would prohibit joinder of OKC since a defunct corporation without assets cannot be resurrected in

"prejudicial" to OKC or to those already parties could result from judgment in OKC's absence since, for all that appears, OKC had no assets or interests, legal or financial, that needed protection and since OKC would not be capable of suing the present parties in its own behalf at some later date. Thus, no "shaping of relief" would be necessary and whether or not "judgment rendered in [OKC's] absence [would] be adequate," addition of OKC as a party would not make it any more so. Finally, it is probable that no "adequate remedy" would be available to Lone Star if we dismiss for non-joinder since it is unlikely that OKC could be joined in a Delaware state court and since, as we are informed, the Delaware statute of limitations appears to have run on Lone Star's contract action.

■ The district court, however, reasoned that no adequate judgment could be rendered in OKC's absence because creation of the Trust violated Delaware law and, alternatively, because the assignment of the construction contract was invalid under the terms of the trust agreement and the contract itself. Thus, the court concluded, OKC was the only party that could have been liable on the contract and therefore was indispensable to Lone Star's suit. While we hold that even this could not render OKC itself indispensable, since it does not exist, we address this reasoning in order to refute any suggestion that it is OKC's legal successor (whomever that may be) that is indispensable. We note that the district court's reasoning is also directed at the very merits of the contract action to the extent that it undermines the possibili-

ty of the Trust's liability. That provides all the more reason for us to address the court's alternative holdings on this issue. We turn first to the court's conclusion that the Trust was not validly created.

### B.

■ Assuming that the Trust came into existence on May 12, 1981, the day following dissolution of OKC itself, the district court held that under Delaware law appointment of the Trust after dissolution was an improper method of "winding up." However, Del.Code Ann. tit. 8, § 278 provides that the corporation itself may conduct winding up, presumably through its officers and directors. *See supra* note 4; *see also In re Citadel Industries, Inc.*, 423 A.2d 500, 504 (Del.Ch.1980). Section 279 of the same title provides for the alternative method of "winding up" by a court-appointed trustee, usually a director of the dissolved corporation, under the continuing supervision of the Delaware Court of Chancery.[6] We think it clear that § 278 permits winding up by a trust such as the one employed here, that is duly created by the directors of the dissolved corporation.

Section 278 expressly continues for three years the corporate existence of a dissolved corporation for certain limited purposes, including discharging its liabilities, distributing its assets and generally winding up its affairs. Likewise, the directors continue in their capacities as directors after dissolution and therefore oversee the final acts of the corporation. *Carle v. International Clay Products Co.*, 15 Del. 166, 132 A. 892, 892 (Del.Ch.1926). In effect, § 278

order to sue or be sued after the three year period has run. *In re Citadel Industries, Inc.*, 423 A.2d 500, 506–07 (Del.Ch.1980) (§ 278 likened to a statute of limitations); *Smith-Johnson Steamship Corp. v. United States*, 231 F.Supp. 184, 186 (D.Del.1964) (same).

**6.** Section 279 of Del.Code Ann. tit. 8 provides, in part:

When any corporation organized under this chapter shall be dissolved in any manner whatever, the Court of Chancery, on application of any creditor or stockholder of the corporation or on application of anyone, who

... shows good cause therefor ... may either appoint 1 or more of the directors of the corporation to be trustees, or appoint 1 or more persons to be receivers, of and for the corporation, to take charge of the corporation's property, and to collect the debts and property due and belonging to the corporation, with power to prosecute and defend, in the name of the corporation, or otherwise, all such suits as may be necessary or proper for the purposes aforesaid ... and to do all other acts which might be done by the corporation, if in being, that may be necessary for the final settlement of the unfinished business of the corporation.

**1550**

prolongs the dissolved corporation's life, giving it authority to decide its own conclusion. *See In re Citadel Industries, Inc.,* 423 A.2d 500, 504–05 (Del.Ch.1980); *Harned v. Beacon Hill Real Estate Co.,* 9 Del.Ch. 411, 84 A. 229, 234–35 (Del.1912) (discussing statutory predecessor of § 278).

While § 278 undoubtedly limits the activities in which a dissolved corporation may engage, nothing in the statute purports to limit in any way the board's discretion as to how permissible activities—such as winding up—may be accomplished. Contrary to the interpretation of the district court, § 278 does not require the directors or officers of a dissolved corporation to execute personally every aspect of winding up. Nor does it prohibit them from vesting such power in a trustee.

*In re Citadel,* 423 A.2d 500 (Del.Ch. 1980), is not to the contrary. In *Citadel* the Delaware Court of Chancery described § 278 as applying to situations "where the dissolved corporation has continuing legal existence and is capable of winding up its affairs through its own officers and directors." 423 A.2d at 504. That language was not intended to suggest that directors and officers must personally oversee every aspect of winding up, but merely to underscore the contrast between dissolution situations in which § 278 would apply (i.e., where the corporation is capable of winding up its affairs on its own, through its own officers and directors, without judicial intervention) and those that call for the application of § 279 (i.e., where judicial intervention is necessary to fill the void left by the officers' and directors' inability or unwillingness to act.). *Citadel,* 423 A.2d at 504–05. So long as a corporation's directors have the authority and will to wind

up the dissolved corporation's affairs, the court held, there is no need to invoke the assistance of the Court of Chancery through § 279. *Id.*

We find no indication either in *Citadel* or in § 278 [7] that the directors may not demonstrate the capability of which *Citadel* speaks precisely by creating and structuring a trust arrangement such as the one with which we are here concerned. The district court held that had the Trust been created prior to dissolution, it would have been valid. However, the propriety of the trust as a winding up device should not depend on the date of its formal effectiveness since under Delaware law, i.e., § 278 and *Citadel,* the formal act of dissolution does not disturb the directors' authority to determine the means by which winding up is to be accomplished.

### C.

Assuming that the Trust itself was properly constituted, the concerted operation of provisions of the construction contract and provisions of the Trust Agreement does not invalidate the attempted assignment to the Trust of OKC's obligations under the construction contract.

The construction contract provides that "OKC shall have the right after April 15, 1981, to assign its rights and obligations under the contract to any financially responsible party." The Trust Agreement itself, at article 6.1, prohibited the Trustee from engaging in any business even to benefit the Trust. This provision was intended to enforce compliance with certain provisions of the Internal Revenue Code, the benefits of which the parties to the agreement sought to reap. The district

---

7. Our reasoning is buttressed by the legislative action that preceded the passage of §§ 278 and 279. In the early 1920's, the Delaware legislature repealed the statute (§ 41) that had formerly automatically made directors, upon voluntary dissolution, trustees in dissolution, with the attendant limitations on their ability to act that are traditionally imposed on the managers of a trust corpus. The statute was replaced with a provision (similar to § 279) that permitted imposition of trust strictures upon director action

only upon an express designation by the Court of Chancery. The move away from automatic imposition of trust strictures indicates legislative intent not to tie the hands of directors in a § 278 situation, but to give them as much authority after dissolution as they had before dissolution. *See Townsend v. Delaware Glue Co.,* 12 Del.Ch. 25, 103 A. 576, 576 (Del.Ch.1918) (text of former Section 41); *Carle,* 132 A. at 892 (effect of repeal of § 41).

court held that the Trust was not a "financially responsible party" under the contract and that the Trust could not, under the Trust Agreement, rightfully "engage in the business" of completing construction of the dock facility. We disagree with both holdings.

We cannot conclude, as a matter of law, that the Trust was not a "financially responsible party." The issue involves not only interpretation of that term in the intention of the parties to the construction contract, but also factual determinations concerning the Trust's financial status. However, the united position the parties have taken relieves us—and the district court—of the burden of adjudicating these issues.

The district court's holding rests on a provision of the construction contract that the parties had the power to waive, modify, or even abrogate completely by agreement. *See, e.g., Husband (P.J.O.) v. Wife (L.O.),* 418 A.2d 994 (Del.1980); *Reeder v. Sanford School, Inc.,* 397 A.2d 139 (Del.Super.Ct. 1979); *Pepsi-Cola Bottling Co. v. Pepsico, Inc.,* 297 A.2d 28 (Del.1972). All parties agree that the assignment to the Trust was valid and effective and that the Trust is now responsible for the obligations of OKC. Indeed, the Trust has actually completed the construction called for by the contract. Whether this is interpreted as a modification of the assignment limitation, or as a waiver of a non-essential term, or as a refusal to nullify a merely voidable assignment, or as an understanding that the Trust was in fact a "responsible party" in the usage of the parties, we need not, nor have we been requested to, decide. It is sufficient that the parties have agreed.

■ When called upon to do so, it is our duty to protect the interests the contract was intended to serve. The remedy for violation of the provision lies in a suit for breach of the contract and avoidance of the assignment by a party to the contract (pre-

sumably Lone Star). Since "financial responsibility" was an issue resolvable in the first instance by agreement of the parties themselves, we hold that the assignment from OKC to the Trust was effective and no impediment to suit against the Trust in the absence of OKC.

■ The district court also held that the Trust Agreement nullified the assignment of the contract obligation because a provision of the Trust Agreement prohibited the Trustee from engaging in any business in the name of the Trust. We disagree with the court's understanding of the legal effect of this provision and of the assignment itself.

First, the provision is to be read in context and construed in light of its clear purpose: to restrict the Trustee's discretion in administering the Trust's assets, thus protecting creditors and settlors alike. The proper remedy for enforcement of the provision would be suit against the Trustee by an interested party for breach of fiduciary duty. The Trust Agreement was approved by OKC's directors in the May 5 resolution, which also provided for transfer of OKC's assets and liabilities to the Trust. To use a limitation on the powers of the Trustee as a device for rendering null an assignment of liability approved in the very document that gave the Trust its life would clearly be contrary to what was intended.

Moreover, the Trustee could assume all of OKC's obligations under the contract without undertaking performance of it by merely assuming the obligation to satisfy any judgment arising from its breach.[8] This would circumvent the need of engaging in business.[9]

■ Rule 19(b) is not intended to exclude considerations, not enumerated, that are applicable in a particular case. *See* Committee Note to amended rule. One such consideration is the expiration of OKC as a legal entity and the consequent futility

---

8. The Trust Agreement explicitly confers on the Trustee the power to defend actions in the name of OKC and to provide for payment of OKC's "liabilities, debts, or obligations."

9. That the Trust actually did complete the construction in no way undermines our reasoning. If this was wrongful, the remedy is elsewhere than in nullification of the assignment.

of joining it. Pragmatic and equitable considerations control the Rule 19(b) analysis. *See, e.g., Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 116 n. 12, 88 S.Ct. 733, 741 n. 12, 19 L.Ed.2d 936; *Schutten v. Shell Oil Co.*, 421 F.2d 869, 873–74 (5th Cir.1970). Indispensability is a conclusory term, applied to a particular party only after the court has examined the enumerated factors and others relevant to the facts of a particular case in the light of "equity and good conscience." *See* Committee Note; *Provident Tradesmens*, 390 U.S. at 118–19 n. 15, 88 S.Ct. at 742–43 n. 15. If after this examination the court is convinced that it cannot proceed without a party, the party is labelled "indispensable" and the action is dismissed. *Id.* We are convinced that this action can and should proceed without OKC as a party since OKC does not exist as a legal entity and since OKC's obligations under the construction contract properly devolved upon the Trust. We therefore hold that OKC is not indispensable under Rule 19(b) in Lone Star's action against the Trust.

### III.

■ The district court dismissed, in the alternative, for failure to state a claim against the Trust under Fed.R.Civ.P. 12(b)(6).[10] The court reasoned that since the Trust was improperly formed and the construction contract was improperly assigned, the Trust could not be held liable under the contract. Having rejected both of these holdings, we conclude that Lone Star stated a claim against the Trust. In addition, on remand, Lone Star should be given leave to amend its complaint if any other infirmities become apparent.

### IV.

We also conclude, contrary to the district court's holding, that OKC was not indispensable to Lone Star's action against Box, OKC Limited Partnership and CKB & Associates, Inc. (collectively, the Box defendants). Our discussion concerning the expiration of OKC and the dissipation of any resulting prejudice under the factors articulated in Rule 19(b) applies with full force here. The Box defendants, however, present additional arguments supporting a finding of unacceptable prejudice. Their arguments are not well taken.

■ Several of the Box defendants' arguments speak to prejudice resulting only from their inclusion in this action and the simultaneous exclusion of the other shareholders of OKC. All shareholders of OKC, of which Box (individually) was one, received assets of OKC as distributions after the limited partnership was created and OKC became the limited partner. Box and CKB & Associates, Inc., also received assets directly from OKC as the only general partners of the limited partnership. Merely because Box claims that the other shareholders of OKC may be liable with him *as a shareholder* does not demonstrate or even affect the indispensability of OKC itself. Under Rule 19(b) the Box defendants must show prejudice and inadequacy of judgment resulting from *OKC's* absence, not the other shareholders'. That they may at

---

10. We first note that the district court's conclusion that the Trust was not "financially responsible" was premised on factual findings made without benefit of the parties' briefing or an evidentiary hearing, or submission of affidavits. The court issued its decision in response to the defendant Box's Rule 12(b)(6) motion. Since the case was dismissed while still in that posture, we would ordinarily reverse if any of the facts as alleged would support a finding that the construction contract obligation was properly transferred to the Trust. *See, e.g., Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957); *Miller v. Stanmore*, 636 F.2d 986, 992 (5th Cir.1981). However, when the district court appeals to matters outside the pleadings in making these factual findings we approach those findings as if made on a motion for summary judgment and reverse if there is any material issue of fact raised in the record. *See* Fed.R.Civ.P. 12(b); Fed.R.Civ.P. 56; *Francis Oil & Gas, Inc. v. Exxon Corp.*, 661 F.2d 873, 879–80 (10th Cir.1981) (Rule 19(b) dismissal reversed where factual issues were raised); *Davis v. Howard*, 561 F.2d 565, 568–69, 570 (5th Cir. 1977). Yet converted orders are ineffective unless they meet the mandatory notice requirements of Rule 56. *Davis*, 561 F.2d at 569–70. However, given our disposition, on issues of law, of the district court's ruling, we need not confront these procedural infirmities.

some point desire to join the other shareholders as third party defendants because Lone Star did not join them as direct defendants is not an argument for OKC's indispensability.

Nor do the "proof problems" that the Box defendants imagine militate in favor of OKC's indispensability. The problems are in fact illusory. For example, to the extent OKC's knowledge and intent in transferring its mineral interests to Box and the limited partnership are relevant, OKC's former directors and officers will be available to testify thereto. Moreover, joinder of OKC itself would in no way help resolve any such problems that actually do confront the Box defendants.

■ *Armour & Co. of Delaware v. B.F. Bailey, Inc.*, 132 F.2d 386 (5th Cir. 1942), does not support the Box defendants' position. There the debtor was considered indispensable because (a) the plaintiff sought to set aside the allegedly fraudulent conveyance, (b) in any event, the debtor had retained, even after the conveyance, "complete dominance and control" of the assets transferred, and (c) the debtor was solvent and financially healthy so that forced joinder would be effective. None of these factors is present here since (a) Lone Star seeks damages, not nullification of the conveyance [11], (b) OKC, the debtor here, has retained no control of the assets transferred,[12] and (c) OKC is defunct and holds no assets whatsoever so that forced joinder would be futile, if not prejudicial to Lone Star.[13] In light of these practical consider-

ations and the Box defendants' failure to call our attention to any other circumstance even remotely resembling actual prejudice, it is clear that OKC is not indispensable to the action against Box. *See Provident Tradesmens*, 390 U.S. at 116 n. 12, 88 S.Ct. at 741 n. 12; *Schutten*, 421 F.2d at 873–74.

The district court relied on Del.Code Ann. tit. 8, § 325 in holding OKC to be indispensable to the action against the Box defendants. Section 325(b) requires that a plaintiff procure a judgment against a corporation where he seeks to recover against officers, directors or stockholders personally for a debt of the corporation.[14] Section 325 does not apply to these facts. This being so, we are not called upon to resolve a conflict between this state statute and Fed.R.Civ.P. 18(b) which permits a plaintiff to bring an action on a fraudulent conveyance without first obtaining a judgment against the debtor. *See, e.g., Hanna v. Plumer*, 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965) (*Erie* doctrine applied to resolve direct conflict between Federal Rule of Civil Procedure and state rule).

■ Lone Star proceeds against Box based on the distributions he received as a general partner of the limited partnership; Lone Star does not seek to "pierce the corporate veil" of OKC and hold Box liable in his capacity as a shareholder of OKC. Section 325 does not apply to such independent causes of action. *See Berwick*, 174 A. at 123–24.

In any event, § 325(a) provides that § 325(b) applies only to claims conferred on

---

11. *See Berwick v. Associated Gas & Electric Co.*, 20 Del.Ch. 265, 174 A. 122, 123–24 (Del.Ch.1934) (debtor not indispensable to extent damages only are sought).

12. *See Keene v. Hale-Halsell Co.*, 118 F.2d 332, 334–35 (5th Cir.1941) (no necessity to join transferor that has "finally parted with all interest in the property conveyed.")

13. *See United States Shoe Machinery Corp. v. Becker*, 7 Fed.R.Serv. 18b.32, Case 1 (E.D.N.Y. 1943) (useless to compel joinder of defunct fraudulent transferor.)

14. Section 325 provides, in full:
    (a) When the officers, directors or stockholders of any corporation shall be *liable by*

*the provisions of this chapter* to pay the debts of the corporation, or any part thereof, any person to whom they are liable may have an action, at law or in equity, against any 1 or more of them, and the complaint shall state the claim against the corporation, and the ground on which the plaintiff expects to charge the defendants personally.
    (b) No suit shall be brought against any officer, director or stockholder for any debt of a corporation of which he is an officer, director or stockholder, *until judgment be obtained therefor against the corporation* and execution thereon returned unsatisfied. (emphasis added).

creditors "by the provisions of this chapter." The chapter referred to, the Delaware General Corporation Laws, permits shareholders and directors to be held liable for the debts of the corporation in certain specific instances. *See, e.g.,* former § 31 of the General Corporation Law which provided that any officer who signed a false certificate would be liable for all debts of the corporation contracted during officer's tenure. Thus, § 325 was meant to prescribe the manner in which such actions were pursued and not to restrict causes of action that had traditionally been available to creditors independently of the corporation law. *See Berwick,* 174 A. at 124; *DuPont v. Ball,* 11 Del.Ch. 430, 106 A. 39, 42 (Del.1918) (predecessor of § 325 not applicable where cause of action not within chapter); *see generally, John A. Roeblings Sons Co. v. Mode,* 17 Pennewill 515, 43 A. 480, 482 (Del.Super.Ct.1899); E. Folk, The Delaware General Corporation Law 481–82 (1972) ("This section is not exclusive of other means of satisfaction ..."). Thus, § 325 provides no basis for dismissal of the action against Box.

### V.

The issue whether Lone Star's complaint stated a claim against Box, CKB & Associates, Inc., and the OKC Limited Partnership is not before us. The district court did not dismiss on this ground. We refrain from deciding this issue until the district court has ruled. *See, e.g., Shuford v. Anderson,* 352 F.2d 755, 765 (10th Cir.1965) (on petition for rehearing). Moreover, the district court, in its opinion, clearly recognized that the essence of Lone Star's claim against the Box defendants was fraud. The issue of fraud was "specifically presented" in the pre-trial order under the heading "Contested Issues of Fact." The absence of any explicit allegation of fraud is the only infirmity pointed out by the Box defendants. Yet it is clear that they had actual notice of the nature of Lone Star's claim. *Cf., Bennett v. Berg,* 685 F.2d 1053, 1058 (8th Cir.1982), *on rehearing,* 710 F.2d 1361 (8th Cir.), *cert. denied sub. nom., Prudential Insurance Co. v. Bennett,* —

U.S. ——, 104 S.Ct. 527, 78 L.Ed.2d 710 (1983). In any event, Lone Star should be permitted to amend its complaint on remand to correct any material omissions.

For these reasons, the judgment of the district court is REVERSED AND REMANDED.