**FERROFLUIDICS CORPORATION**

v.

**ADVANCED VACUUM COMPONENTS, INC., Todd A. Sickles, Perry E. Barker and Akira Yamamura.**

No. C–92–80–L.

United States District Court, D. New Hampshire.

April 22, 1992.

Mark Howard, Merrill & Broderick, Manchester, N.H., and William Connell, Gibson, Dunn & Crutcher, San Jose, Cal., for Advanced Vacuum.

Jeffrey Mann, Ruben, Baum, Levin, Constant and Friedman, New York City, and George Moore, Devine, Millimet & Branch, Manchester, N.H., for Ferrofluidics.

## FINDINGS OF FACT AND RULINGS OF LAW

LOUGHLIN, Senior District Judge.

The procedural history of the litigation in the Federal Court for the Northern District of California and the action filed in this court is important.

Defendant Sickles signed a covenant not to compete (covenant) in New Hampshire when he was first employed by the plaintiff. Having some reservations about the legality of his incorporating Advanced Vacuum Components (AVC) in light of the agreement, Sickles received legal opinions from attorneys in Pennsylvania and California. He learned that California law looked with disfavor on these covenants and AVC was incorporated there.

Really playing it close to the vest, defendants thought the best defense was a good offense. On November 22, 1991, in California they thought they had beat the plaintiff to the punch when they filed a petition

seeking declaratory relief with respect to the enforceability of the covenant. Shrewdly, they held off completion of service on the plaintiff in this case until February 25, 1992. On February 14, 1992, plaintiff effected service upon AVC corporation and Sickles in this action. In the time period involved plaintiff was unable to complete service on Yamamura, a Japanese national. Foreign nationals must be served in accordance with the Hague Convention, which, from this court's experience is a long drawn out process taking months.

Defendants then moved to dismiss this action asserting that this court lacked jurisdiction for failure to join indispensable party, Mr. Yamamura. They also argued that the California declaratory judgment, being prior in time, provided an adequate remedy and alternatively that venue for this action was properly in California.

While the plaintiff would have preferred to have defendant Yamamura a party to this action, its counsel sagely dropped him as a defendant. This was done presumably to avoid any dilatory tactics of the defendants and to eschew irreparable harm by trying the case before this court as soon as feasible.

Ferrofluidics was incorporated in the Commonwealth of Massachusetts in 1968 and its principal place of business is in Nashua, New Hampshire. It develops and manufactures state-of-the-art magnetic fluid rotary seals which it markets and sells to the semiconductor manufacturing industry and other process control industries. It sells throughout the United States and has substantial sales in Massachusetts. Through plaintiff's efforts this magnetic fluid has been developed and improved.

AVC was incorporated in California on April 16, 1991. Its principal place of business is in Santa Clara, California. AVC also has offices in Garland, Texas and Pittsburgh, Pennsylvania.

Sickles was formerly employed as general manager of the division of Ferrofluidics dealing with marketing and sales of magnetic fluid rotary seals known as the seals division.

Barker was formerly employed as the regional sales manager of the seals division for southeast, southwest and Rocky Mountains regions of the United States.

Akira Yamamura is a resident of Japan, the chief executive officer of Nippon Ferrofluidics Corporation, a Japanese corporation.

In 1991 the rotary vacuum seal business done by Ferrofluidics in the United States was 7.4 million. AVC booked $34,000 in sales by the time of trial and actually shipped approximately $26,000 worth of product.

AVC does not manufacture, assemble or design the seals it sells. AVC receives its seals from a Japanese company Advanced Vacuum Seals, Inc. ("AVS").

The seals that AVC sells are manufactured and assembled by NFC and subsequently transferred to AVS.

NFC manufactures, markets and sells magnetic fluid rotary seals under a license agreement with Ferrofluidics dated April 14, 1987. Under the license agreement the territory of the license is limited to Japan and all other Asian countries. NFC was formerly a wholly owned subsidiary of Ferrofluidics. NFC paid Ferrofluidics a royalty on products which it sold.

NFC had access to Ferrofluidics technology on new things that were developed and proprietary technology. The primary use of magnetic fluid rotary seals is in providing contamination free environments for the manufacture of high performance semiconductors.

Ferrofluidics incurs substantial annual research and development costs in the approximate sum of 1.4 million dollars and attempts to protect its proprietary technology and trade secrets by requiring most employees to sign non-disclosure agreements that include a covenant not to compete for a period of five years after the employee leaves Ferrofluidics.

Sickles thus set forth on a course which was Machiavellian in design. He knew that fellow employees such as Barton, Barker and Granoff were, like he, probably

disenchanted with their employer and looking for new job opportunities.

In December, 1989 Sickles met with Yamamura in Japan. Yamamura told him that if he ever left the plaintiff's employ to contact him. When Sickles met Yamamura this was on plaintiff's business. While general manager of the plaintiff, Sickles was in the process of setting up a company to import NFC seals to sell them in America competitive to his employer. This was in June, 1990.

Sickles also met with Dr. Koichi Goto, second in command of NFC, in the summer of 1990 at a restaurant in Merrimack, New Hampshire. He was aware at this time that NFC had exclusive rights to market the plaintiff's product in Asia but could not sell in the American market.

Dr. Goto was in New Hampshire concerning business with Ferrofluidics. Sickles suggested to Dr. Goto the possibility of selling NFC's rotary seals into the American market. The substance of this meeting was naturally never conveyed to the plaintiff. Dr. Goto told Sickles that he ought to prepare a business plan.

After the meeting with Dr. Goto, Barker was approached two or three weeks prior to the Toronto show by Sickles. Barker was a sales representative in Texas employed by the plaintiff for over six years. Sickles received information from Barker and Barton as to their inputs into business they had received while working for the plaintiff. Sickles, Barton and Barker believed that NFC would directly finance the venture. At the trade show in Toronto, Canada, Granoff and Kuster, two other Ferrofluidics employees were brought into the plot.

Sickles was the principal author of the business plan. The plan was to start up a new company to distribute rotary seals with an experienced field sales personnel. It stated that in five years they expected to capture 54% of the domestic rotary seal market from the plaintiff. Obviously penetrating the United States market would be greatly enhanced through the utilization of key Ferrofluidics ex-personnel.

They consciously attempted not to sell the product anywhere in New England, not through altruism, but to eschew possible litigation.

The plan was eventually sent to Yamamura in Japan. Sickles retained Nina Yablock, a California attorney, to set up AVC corporation in California while he was working for Ferrofluidics.

Sickles let Ferrofluidics employees, Jusef and Ludwig go knowing full well that they had not expressed a desire to leave the company and retained Barker and Barton who were going to be with him in the new venture. Barton was later informed that he would not be part of AVC.

After a Ferrofluidics business trip to California Sickles and Granoff stopped in Pittsburgh and received legal advice on the do's and dont's concerning the proposed new venture.

When consulting with counsel in Pittsburgh, Pennsylvania, additional advice was given as to which jurisdiction would be reluctant to enforce the covenant agreement. They learned that California looks disfavorably on these agreements.

Attorney Nina Yablock represented both Sickles and Yamamura. In December, 1990 Sickles met with Yamamura in Boston, Massachusetts. The month before they had met in Nashua, New Hampshire. There was a mutual agreement to proceed and funding of AVC was discussed. At the Boston meeting Yamamura indicated that Ferrofluidics had breached its agreement with NFC giving NFC the right to sell seals in the United States.

On January 7, 1991 Sickles dictated a memorandum to his secretary Ms. Hopper which was sent to Yamamura. This was regarding furnishing of product and financing by Yamamura. The memorandum also stated that because of plaintiff's financial problems it would be difficult for the plaintiff to bring legal action against AVC.

In April, 1991 Sickles flew to San Jose, California on Ferrofluidic's business. While there a meeting was set up with Attorney Nina Yablock and Akira Yamamura. Yamamura set up the financing for

AVC. Yamamura stated there was a hold-up in the funding. As already stated, AVC was incorporated on April 26, 1991. Sickles owns 75%, Barker 25% of the voting stock.

Advanced Materials Research Limited (AMRL) is a company located in Hong Kong. It apparently is a front for NFC which did not want to sell directly to defendant AVC. If AVC went public AMRL could conceivably own 90% of the common stock.

Products were received from a company in the Pacific called AVS. The contact with AVS was one Hiroyuke Watanabe.

To date AMRL has paid $30,000 in legal fees which are guaranteed to a maximum of $100,000.

The last week in May, 1991 AMRL transferred $120,000 to AVC, plus an additional $270,000 to $300,000 for a total sum in the $390,000 to $420,000 range.

Granoff, who was upset with pangs of conscience coupled with feelings of disloyalty to his employer, later told Sickles and Barker that he wanted nothing to do with the venture. In fact, due to remorse and some trepidation he left the plaintiff's employ.

On May 31, 1991 Sickles resigned with some compunction about what Ferrofluidics would do if it became aware of his machinations. Sickles never learned what the fluid formula of the plaintiff was perhaps because it would have been of no use to him in his proposed new business. He did admit that he had his secretary Patricia Hopper print out two copies of the customer list of Ferrofluidics for him.

Price lists appear to be available and customers usually tell salesmen of their competitors' prices. Ferrofluidics is aware of what the competitor Rigaku charges for its product. Ferrofluidics publishes a standard price list with its sales catalogue.

There is no question that AVC is a direct competitor of Ferrofluidics. AVC markets and sells magnetic fluid rotary seals to the semiconductor manufacturing industry.

The Ferrofluidics product has the company name on it; the AVC product has no name on it.

NFC manufactures, markets and sells magnetic fluid rotary seals under a license agreement with Ferrofluidics dated April 14, 1987. Under the license agreement the territory of the license is limited to Japan and all other Asian countries. NFC was formerly a wholly owned subsidiary of Ferrofluidics. NFC pays Ferrofluidics a royalty on products which it sells.

Over the years Ferrofluidics has built up goodwill in its business relationships with its customers in the United States.

With respect to Sickles, assertions that he was not aware that signing of the covenant was a condition of employment until after he was hired, rings hollow. Prior to his employment on December 9, 1985 he was sent a letter by Ferrofluidics on November 18, 1985 that he must sign a covenant. Ferrofluidics acted in good faith and did not coerce Sickles to sign the covenant.

Sickles held a very responsible position with Ferrofluidics at a more than reasonable salary. After becoming privy to technology, company policy, trade secrets of a tangible and intangible nature, marketing structure and general company know how, he covertly violated in an amoral and reprehensible manner Ferrofluidics' trust in him.

The covenant was not unreasonable in restricting Sickles from competing in the very business that Ferrofluidics employed him in. The length of the covenant, taking also into consideration the geographical area of the United States, is not so reasonable.

With respect to Barker it appears from the evidence that the failure to have him sign the covenant was perhaps an oversight by Ferrofluidics. Barker was and is a salesman with much experience. He was not as privy to the inner workings of his former employer as Sickles. Albeit, he next to Sickles, was a prime mover in the plot to eschew his loyalty to Ferrofluidics by aiding and abetting the underhanded methods to set up AVC as a direct competitor of his former employer. Efforts were

made by both Sickles and Barker to keep Ferrofluidics in the dark.

To recapitulate, Sickles' and Barker's asseverations that they believed that they were advancing the best interests of their employer during the time period involved in their devious plot is disingenuous. Both of them were aware of the NFC–Ferrofluidics agreement and they conspired with Yamamura and Dr. Goto to ignore it or violate its terms. Whether fellow employees were disgruntled or not, they inveigled them to leave Ferrofluidics employ, Sickles laid off Jusef and Ludwig who were not involved in the plot and retained Barker, Kuster and Barton who were initially in on the scheme. Sickles stole customer lists. Surreptitiously, on company time, Sickles and Barker set up a corporation, AVC to directly compete with Ferrofluidics. Occasionally, on company time, meetings with Yamamura, Dr. Goto, Attorney Nina Yablock and other counsel were held to circumvent the covenant. Indirectly they went along with Yamamura's scheming to set up dummy Japanese corporations to obfuscate Ferrofluidics in any proposed legal actions. Suit was brought in the Federal Court in California on the pretext of a declaratory judgment and allegations by NFC that Ferrofluidics had violated its agreement with NFC in order to have venue in California.

JURISDICTION, STAY OF PROCEEDINGS, VENUE

Defendants at the first court hearing raised three issues. Lack of personal jurisdiction, staying this action because the action in California was first in time, and in the alternative, venue should be changed to California.

The court ruled from the bench that this court has jurisdiction, the motion to stay was denied and venue should be here, not California.

At the risk of being tautological having heard all the evidence in this case the court reaffirms its prior rulings.

■ "In actions where jurisdiction is not based solely on diversity of citizenship, venue is proper in the judicial district ... in which the claim arose...." 28 U.S.C. § 1391(b). The plaintiff has the burden to establish that venue is proper in this district. *Lex Computer & Mgmt. v. Eslinger & Pelton, P.C.*, 676 F.Supp. 399, 406 (D.N.H.1987); 15 Wright & Miller § 3826 (1986 Supp.1992); *Delta Education, Inc. v. Langlois*, 719 F.Supp. 42, 49 (D.N.H.1989).

The court has jurisdiction and venue for reasons which in some instances overlap. Sickles and Barker were employees of Ferrofluidics. Sickles resided in Nashua, New Hampshire, Barker in Garland, Texas. AVC was Sickles', Barker's and Yamamura's creation. The following acts took place in whole or in part in New Hampshire. The signing of the agreement by Sickles and his subsequent breach of it, concerted actions of both Barker and Sickles in usurping certain trade secrets, stealing of the customer list by Sickles, conspiracy of Barker and Sickles in setting up a competing corporation by using information supplied to them while employed by Ferrofluidics in conjunction with Yamamura and Dr. Goto, clandestine meetings between Sickles, Yamamura and Dr. Goto with Barker present on at least one occasion but uninvited, preparation of the business plan of NFC and AVC, agenda for the meeting in Toronto, Canada whereby Ferrofluidics' employees were inveigled to leave its employ, and working towards AVC's fruition while employed by Ferrofluidics and further insult to injury was the use of a Ferrofluidics secretary to aid in the formation of AVC.

Additionally with respect to venue in California. Sickles moved there in the summer of 1991 with the intention of instituting litigation there which he did in a very short period of time. Then Ferrofluidics was purposely kept in the dark about the California suit until three weeks after suit was brought in New Hampshire.

With regard to a stay of proceedings, defendants cite *Centronics Data Computer Corp. v. Merkle Korff Industries*, 503 F.Supp. 168 (D.N.H.1980), which is not apposite considering the facts and circumstances of this case. The argument of waste of time, judicial resources and litigation costs is now moot. It is also interest-

ing to note that while Yamamura was dropped as a party his ethereal presence was in this court. For two days of the hearing counsel unofficially representing Yamamura was in the courtroom.

## INDISPENSABLE PARTY, RULE 19

On March 25, 1992 defendants moved to dismiss this case under Rule 19 of the Federal Rules of Civil Procedure, for failure to join an indispensable party. Defendants contend that a central issue in this case is whether Nippon Ferrofluidics Corporation ("NFC") violated a licensing agreement with plaintiff, because it necessarily involves a determination of whether NFC has the right to distribute seals in the United States. Defendants maintain that equitable principles dictate that an action that would adjudicate parties' rights pursuant to a contract must be dismissed unless all parties to such contract can be joined in the action. Defendants assert that even if a judgment by this court would not have *res judicata* effect on NFC, an adverse ruling would be a persuasive precedent in a subsequent proceeding and may subject them to inconsistent obligations. Further, defendants argue that as a practical matter continued prosecution of this action without NFC might impair or impeded NFC's ability to protect its interests. Moreover, defendants assert that even if *res judicata* does not apply, Ferrofluidics would be able to initiate another action directly against NFC, resulting in piecemeal litigation. Lastly, defendants argue that all of the claims raised in this action by Ferrofluidics may properly be adjudicated in the AVC action brought in California, which they argue is the more appropriate forum because they assert that the substantial part of the activities complained of in this action occurred in California.

Plaintiff replies that the judgment it seeks against defendants will not affect the rights of NFC pursuant to its license agreement with plaintiff. Plaintiff maintains that if it is granted the relief it requests, enjoining defendants from competing against plaintiff, NFC may still continue to sell its products to AVS as it has

purportedly been doing, without fear of violation of this Court's injunction order.

Plaintiff asserts that the resolution and determination of its claims, which include allegations of: breaches of fiduciary duties owed to plaintiff, misappropriation of plaintiff's proprietary information, false representations made about plaintiff, violations by defendant Sickles of his non-disclosure agreement and contractual covenant not to compete against plaintiff and the defendants' tortious interference with plaintiff's advantageous business relations, do not depend upon the presence of NFC in this proceeding nor will the findings of fact or conclusions of law made here have any *res judicata*, collateral estoppel or other preclusive affect upon the rights of NFC.

■ The determinations of whether a party is "indispensable" under Rule 19 involves a two step analysis. First, the court must determine whether NFC is a "person to be joined if feasible" under Rule 19(a). That is, the court must decide whether NFC is a "necessary party". *See Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 116–118 & n. 12, 88 S.Ct. 733, 741–42 & n. 12, 19 L.Ed.2d 936 (1968); *Pujol v. Shearson American Express, Inc.*, 877 F.2d 132, 134 (1st Cir.1989).

■ If NFC is determined a necessary party, the court then proceeds to the second step in the analysis, which is contained in Rule 19(b). Under Rule 19(b) the court must decide whether "in equity and good conscience the action should proceed among the parties before it, or [alternatively whether the action] should be dismissed." Rule 19(b), Fed.R.Civ.P. Dismissal of the action follows from a finding that NFC is an "indispensable party".

There is no prescribed formula for determining in every case whether a person is an indispensable party. *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 88 S.Ct. 733, 19 L.Ed.2d 936 (1968). The determination of whether a particular nonparty is necessary to an action is heavily influenced by the facts and circumstances of each case. *Confederated Tribes v. Lujan*, 928 F.2d 1496 (9th Cir. 1991). In determining if the absent party

is necessary, the court must consider if complete relief is possible among those parties already in the action, and must then consider whether the absent party has a legally protected interest in the outcome of the action. *Id.*

■ When assessing the interest of an absent party for the purposes of an indispensability determination, the court can properly consider the nonparty's ability to intervene under Rule 24, but the ability to intervene cannot control the indispensability determination. *Travelers Indemnity Company v. Dingwell,* 884 F.2d 629 (1st Cir.1989). A party is "indispensable" only if the claims raised cannot be adjudicated without it. *Shelton v. Exxon Corp.,* 843 F.2d 212 (5th Cir.1988). "Indispensability" is a conclusory term applied to a particular party only after the court has examined the factors relevant to the facts of a particular case in light of equity and good conscience. *Lone Star Industries, Inc. v. Redwine,* 757 F.2d 1544 (5th Cir.1985).

Rule 19(a) identifies three categories of necessary parties. NFC will be labelled a "necessary party" if, in its absence, (1) complete relief cannot be accorded the present parties, or (2) the disposition of the action would prejudice, as a practical matter, NFC's ability to protect its own interest, or (3) any of the present parties would be subject to a risk of multiple or inconsistent obligations. Rule 19(a), Fed.R.Civ.P. Rule 19(b) sets forth four nonexclusive, overlapping factors to be considered by courts in evaluating whether an absent party is indispensable. Rule 19, Fed.R.Civ.P., advisory committee's note (the four "factors [contained in Rule 19(b) ] are to a certain extent overlapping, and they are not intended to exclude other considerations which may be applicable in particular situations").

The Supreme Court has identified the concerns of four groups whose interests are balanced by the rule. They are: (1) the plaintiff, (2) the defendant, (3) the absent party, and (4) the courts and the public. *Provident Tradesmens Bank v. Patterson,* 390 U.S. at 109–111, 88 S.Ct. at 737–38.

Defendants argue that NFC must be joined because a central issue in this case, whether NFC violated a licensing agreement with plaintiff, necessarily involves a determination of whether NFC has the right to distribute seals in the United States. The court finds that NFC's interest in this litigation is the same as AVC's, and, therefore, rejects defendant's argument in this regard. In so finding, the court notes that NFC enabled Sickles to start up AVC by funding this venture. Moreover, they have guaranteed up to $100,000.00 for litigation costs. Their attempts to shield their identity, or avoid selling directly to AVC through the corporations they have set up (AMRL and AVS) should not enable them to now claim that they are an "indispensable party" and that therefore, this action must be dismissed. To do so, would in this court's opinion, enable defendants to profit from their own wrongdoing.

■ The party making the Rule 19 motion has the burden of proof to establish that:

(a) complete relief cannot be accorded between the parties in the absence of the nonparty; or

(b) the absent parties claim interests relating to the subject matter of the action and are so situated that the disposition of the action in their absence may,

"(1) as a practical matter impede their ability to protect those interest, or

(2) leave any of the persons already parties subject to a substantial risk of incurring inconsistent obligations."

*See Francis Oil & Gas v. Exxon Corp.,* 661 F.2d 873, 876 (10th Cir.1981).

■ Obviously none of NFC's rights or obligations will be ultimately determined in a suit to which it is not a party. *See Mallow v. Hinde,* 25 U.S. (12 Wheat.) 193, 6 L.Ed. 599 (1827); 7 C. Wright & A. Miller, Federal Practice & Procedure § 1611, at 112 (1972). Moreover, the court finds that NFC has not become an indispensable party to this action simply because its rights and obligations under an entirely separate contract (the licensing agreement) may be

affected by the results of the action. Any inconsistencies which may arise from NFC's obligations to AVC and plaintiff will result from their voluntary actions which impose inconsistent obligations rather than from their absence in the present proceedings.

For the foregoing reasons, the court denies defendants' motion to dismiss for failure to join NFC.

## CHOICE OF LAW

Defendants contend that this court should apply the law of California with respect to the covenant. Plaintiff claims that the law of the Commonwealth of Massachusetts is apposite. The court opines that the law of New Hampshire is applicable to the facts and circumstances of this case.

The plaintiff was incorporated in the Commonwealth of Massachusetts and does have substantial sales of magnetic rotary seals in that state.

■ Defendant AVC was incorporated in California, Sickles now resides there and Barker is a resident of Texas. The court has already commented in some detail about the devious methods defendants have used to come within the aegis of California law.

The court is persuaded to apply New Hampshire law for the following reasons. The agreement was signed in New Hampshire, Sickles was employed in Nashua, manufacturing and corporate offices are in New Hampshire, many of the scheming acts of the defendants were in New Hampshire, the jurisdiction of the court is in New Hampshire and a complete hearing on the merits of the case took place in this court.

■ A federal court hearing a case in diversity must apply the choice-of-law rules of the forum state. *Klaxon v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941).

In *Allied Adjustment Service v. Heney*, 125 N.H. 698, 484 A.2d 1189 (1984), it was held that choice of law in a contract case absent an express choice is governed by the intentions of the parties and their reasonably justified expectations. Further where parties to a contract select the law of a particular jurisdiction to govern their affairs, that choice will be honored if the contract bears any significant relationship to that jurisdiction.

The court notes with interest paragraph seven of the agreement stating in essence the following. Any dispute or disagreement shall be settled by arbitration in Boston, Massachusetts. Apparently defendants waived this by bringing suit in California and the plaintiff by bringing suit in this jurisdiction has also waived the arbitration provision.

## COVENANT NOT TO COMPETE

■ By letter dated November 18, 1985, Ferrofluidics offered Sickles a position as Product Manager, Process Equipment. The letter also informed Sickles that he would "be required to sign a nondisclosure agreement covering the proprietary activities of the corporation." On December 9, 1985, the first day of his employment, he signed the Non–Disclosure Agreement, without any protest or reservation.

Paragraph 12 of the Agreement contains the covenant not to compete. It provides in pertinent part:

12. You will not, for a period of *five (5)* years after the date of any termination of your work with the Company or any affiliate, directly or indirectly compete with any business conducted by the Company or by any affiliate, either directly or indirectly, whether as an employee, agent, consultant, partner, person or business which so competes with the Company. For the purposes hereof, "compete" shall mean (i) the solicitation, or acceptance without solicitation, of business with respect to a) ferrofluids, or b) crystal growth devices or processes from any person or entity, or (ii) the solicitation of other business from any client, customer or person with whom you have transacted business during the period of your employment (or with whom you are negotiating prior to termination of your employment), provided, however, that nothing in clause (ii) shall prohibit you from transacting business

with any such person during such period if the business you solicit or accept is not competitive with the services or products offered, furnished, or sold by the Company to such person prior to your termination. You further agree that for a period of *five (5)* years following the termination of your employment, you will not induce or attempt to induce employees of the Company to leave its employ and that during such *five (5)* year period, you will not employ or cause to be employed any such employees in any business in which you may be financially interested or be employed.

Counsel for defendant Sickles asserts that Sickles was not aware of this restrictive covenant until after he had moved his family to New Hampshire and begun his employment at Ferrofluidics. However, the facts indicate otherwise. Sickles was advised that he would be required to sign a non-disclosure agreement when he received the employment letter in Pennsylvania.

In New Hampshire the Supreme Court has stated that "the law does not look with favor upon contracts in restraint of trade or competition." *Dunfey Realty Co. v. Enwright,* 101 N.H. 195, 197, 138 A.2d 80, 82 (1957). Such contracts are to be narrowly construed. *See Home Gas Corp. v. Strafford Fuels, Inc.,* 130 N.H. 74, 534 A.2d 390 (1987). Nonetheless, restrictive covenants are valid and enforceable if the restraint is reasonable, given the particular circumstances of the case. *Smith, Batchelder & Rugg v. Foster,* 119 N.H. 679, 683, 406 A.2d 1310, 1312 (1979).

To determine the reasonableness of a restrictive covenant ancillary to an employment contract, New Hampshire courts employ a three-pronged test: first, is the restriction greater than is necessary to protect the legitimate interests of the employer; second, does the restriction impose an undue hardship on the employee; and third, is the restriction injurious to the public interest? *Technical Aid Corp. v. Allen,* 134 N.H. 1, 7–10, 591 A.2d 262, 265–66 (1991) (citing *Smith, Batchelder & Rugg v. Foster,* 119 N.H. 679, 683, 406 A.2d 1310, 1312 (1979)).

Disproportionate hardship is regarded as a reason for refusing remedies, both equitable and legal. *Technical Aid Corp.,* 134 N.H. 1, 13–15, 591 A.2d 262, 269 (1991) (citations omitted). To determine whether hardship is disproportionate, the consequences to the employer if the covenant is held invalid should be compared with the consequences to the employee if the covenant is held valid. *Id.* [T]he proper question is whether the covenant was reasonable when signed ... *Id.* The consequences to the employee of enforcement of the covenant depends on the employee's prospects for future employment. *Id.*

Defendants assert that whether the restrictive covenant is analyzed under California or New Hampshire law, it is unenforceable, because it is not reasonable. As the court has already stated, it will apply New Hampshire law to determine the validity of the restrictive covenant.

First, defendants argue that the covenant is unreasonable with respect to its duration (5 years). Defendants' Proposed Findings of Fact and Conclusions of Law. The court finds that this time period is overly broad. New Hampshire law permits a court to modify an overly broad restrictive covenant if the employers first show that they acted in good faith in the execution of the employment contracts. *Smith,* 119 N.H. at 682, 406 A.2d at 1313 (citations omitted). The court finds that plaintiff acted in good faith as Sickles was aware of the restrictive covenant, before he moved to New Hampshire or accepted the employment. The court also finds that plaintiff has established that it will incur a justifiable hardship if this covenant is held invalid. This hardship is much greater than any hardship that defendants can establish, if the covenant is held valid. Therefore, the court finds it appropriate to modify this restrictive covenant with respect to time. The covenant is hereby modified to a period of three years, to run from the date Sickles and Barber left Ferrofluidics on May 31, 1991. The restrictive covenant will remain in effect until June 1, 1994.

Second, defendants assert that given the relative sizes of the parties and the unlimit-

ed scope with respect to both the nature and geographic location of the customers included—the restriction clearly imposes an undue hardship on the employee, without providing (Sickles) any compensation. The court disagrees with this characterization. Sickles, as stated above, had notice of this restrictive covenant before he accepted employment. Moreover, his continued employment over a five and a half year period with the plaintiff constitutes consideration sufficient to support this restrictive covenant. *See Smith,* 119 N.H. at 683, 406 A.2d at 1312. When he resigned his employment on May 31, 1991, his salary was in the $80,000.00 per annum range.

Additionally, the court does not find that the unlimited geographic scope of this restrictive covenant renders it unreasonable. As previously stated, in New Hampshire, restrictive covenants are valid and enforceable if the restraint is reasonable given the particular circumstances of the case. *Id.*

The business relationships between Ferro and its customers throughout the United States, cultivated over many years, constitute valuable goodwill of Ferro. Sickles, as General Manager of Ferro's seals division was responsible for the development, engineering, manufacturing and nationwide marketing and sale of magnetic fluid rotary seals. The restrictive covenant at issue is reasonable, despite the absence of a specific limit on its geographical scope, because Ferro's need for protection covers the entire United States. *See Sigma Chemical Co. v. Harris,* 605 F.Supp. 1253, 1260 (E.D.Mo.1985).

When comparing the hardship that Sickles and Barker will incur if the covenant is held valid with the hardship that plaintiff will incur if it is held invalid, the court finds that the equities weigh in favor of enforcing this covenant as modified. The provisions of the restrictive covenant are reasonable and necessary to protect the legitimate business interests of Ferro (i.e., its confidential proprietary technology and its valuable goodwill in the form of nationwide customer relationships and contacts), and are reasonable, in time and scope. If hardship is imposed upon Sickles it is of his own doing. He was aware of probable legal problems as evidenced by seeking legal advice on so many occasions. Sickles and AVC can readily sell other products. Moreover, the business and technical skills of Sickles are not so specialized as to limit him to employment in fields related to magnetic fluid technology.

Finally, with respect to the third prong of the test, defendants argue that the restrictive covenant is injurious to the public interest by stifling competition in the market for magnetic fluid rotary vacuum seals. A restrictive covenant must *unreasonably* limit the public's right to choose before it will be found to be injurious to the public interest. *Technical Aid Corp.,* 134 N.H. at 10–11, 591 A.2d at 267. (emphasis in original). In light of this standard, the court finds that, with respect to the unusual facts and circumstances of this case, the covenant is not an unreasonable restraint on competition. In making this finding the court notes the following factors. The product which defendant seeks to market in the United States is an invention of Dr. Moskowitz, for which he has sought patent protection. Plaintiff has expended considerable sums to develop this product. The harm which plaintiff will suffer if the covenant is declared invalid far outweighs any harm that defendants will suffer if the covenant is declared valid.

For the foregoing reasons, the court finds that the restrictive covenant is valid, subject to the aforementioned modification to a period of three years.

## PROPRIETY OF PERMANENT INJUNCTIVE RELIEF

"(T)he determination whether to issue an injunction involves a balancing of the interests of the parties who might be affected by the Court's decision—the hardship on plaintiff if relief is denied as opposed to the hardship to defendant if it is granted...." 11 C. Wright & Miller, Federal Practice and Procedure: § 2942 at 366–67 (1973). Moreover, "the main prerequisite to obtaining injunctive relief is a finding that plaintiff is being threatened by some injury for which he has no adequate legal remedy." *Id.* at

368–69. Ferrofluidics is entitled to permanent injunctive relief in this case.

It is pristine that the defendant Sickles is violating the restrictive covenant in his employment agreement and AVC is his alter ego. It may be argued that the sales of AVC are minuscule in comparison to Ferrofluidics, but AVC is in its incipient stages. AVC, similar to most new businesses, expects to operate at a loss over the next few years and its future plans to garner 54% of the market may be grandiose. On the other hand, AVC is a definite threat to Ferrofluidics. Also to be considered is AVC's hubristic disregard for the agreement between NFC and Ferrofluidics which can have dire consequence for the plaintiff if AVC is allowed to ignore it. Defendants have aggressively sought Ferrofluidics customers. "The breach of a covenant not to compete may cause the loss of customers of an unascertainable number or importance." Restatement (Second) of Contracts § 360(a) & comment b, at 172 (1981). There can be no "reasonable certainty" of the loss of income as to Ferrofluidics business as a result of defendants' activities. See *Equifax Services, Inc. v. Hitz*, 905 F.2d 1355, 1361 (10th Cir.1990) (preliminary injunction due to the inadequacy of the remedy at law for loss of customers). It is the opinion of this court that the threat of harm to Ferrofluidics if an injunction is not granted under the unique and bizarre circumstances of this case greatly outweighs the threat of harm to the defendants in this case.

It is hereby ordered, adjudged and decreed that the defendants, their agents, servants and employees are ordered and restrained from doing the following. Engaging, directly or indirectly in any business manufacturing or selling anywhere in the United States magnetic fluid rotary seals, other than exclusion seals for computer disc drives, magnetic fluids for use in audio loudspeakers or inertia dampers using magnetic fluids. Using or disclosing any trade secret or other confidential information that is the property of plaintiff which defendants acquired by reason of their employment with the plaintiff.

The court denies plaintiff's requests for damages in the sum of $34,000, $68,000 in exemplary damages, claim for damages in the sum of $85,000 against Sickles, and $60,000 against Barker; apparently these sums are their salaries for the last year that they were employed by plaintiff.

The court in view of the evidence before it that defendants believed that plaintiff because of financial problems might be reluctant to exercise their legal prerogatives in this case, will consider plaintiff's request for attorneys fees. A proper submission of an itemized bill as to costs and fees shall be submitted to this court within ten days of the receipt of this order with the opportunity by the defendants to respond ten days thereafter.

The injunctive relief pertaining to the covenant not to compete will expire on June 1, 1994.