Legault v. aRusso                    CV-93-365-B    02/10/94 P

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Michelle Legault

    v.                              Civ. No. 93-365-B

Ralph aRusso, et al.

## O R D E R

Michelle Legault brings this employment discrimination action pursuant to 42 U.S.C. §§ 2000e et seq. ("Title VII") and 42 U.S.C. § 1983. She alleges that the Johnston, Rhode Island Fire Department (the "Department) used invalid, gender-biased physical ability tests to select new recruits; that these tests excluded her from the selection process; and that, as a result, she was wrongfully denied employment as an entry-level firefighter.[1] Defendants are the Town of Johnston; Ralph aRusso, individually and in his official capacity as town Mayor; and Alan Zambarano, individually and in his official capacity as Chief of the Johnston Fire Department. Legault has moved for a preliminary injunction requiring defendants to hire her

---

[1] Plaintiff also asserts pendant state constitutional, statutory and breach of contract claims.

1

immediately, and presently objects to Magistrate Judge Barry's recommendation that I partially deny her the relief she requests. As I find that Legault is entitled to immediate instatement, I decline to follow Magistrate Judge Barry's recommendation and grant the requested relief in full.

## I. FACTS

This case arises from the efforts of Mayor aRusso (the "Mayor") and Chief Zambarano (the "Chief") to create a pool of qualified, trained recruits that the Department can draw upon to fill permanent entry-level firefighting positions. Prior to 1992, vacant or newly-created positions were filled by hiring individuals who had previously served with the Department as volunteer or part-time firefighters.[2] By 1992, however, this reservoir of experienced firefighters was exhausted. Thus, when the Mayor agreed to appropriate the funds for eight new entry-level firefighting positions, the town had no recruits ready to fill these positions. The Mayor and the Chief therefore decided to solicit applications and then "do like the surrounding

---

[2]In prior years, Johnston had a "call" system in which men and women would be paid an hourly rate to serve as part-time firefighters, working and training alongside the permanent firefighters. To become call firefighters, applicants merely had to contact their area call captain.

2

communities and larger cities do" -- devise their own procedures
to select and train the best-qualified applicants.

## A.   The Testing Procedures

After conducting some informal research,[3] the Chief and his
deputy settled on a three stage selection process.  First, an
applicant had to meet certain threshold requirements.  He or she
had to fill out an application form, hold a valid driver's
license, and be EMT-certified by the state of Rhode Island as of
the application deadline.  Each applicant also had to pass a
criminal record check.  If these requirements were met, the
applicant was entitled to go on to stage two.

The second stage of the selection process was a four-part,
pass/fail physical agility test.  Applicants were required to (1)
climb a 100' ladder and then come back down; (2) remove, set down

---

[3]The Chief stated that he read the 1987 National Fire
Protection Association recruit-training guidelines and consulted
the International Firefighter's Federation Manual; that he and
his deputy polled the chiefs of four neighboring communities to
determine the types of physical tests they administered; that he
visited the Providence Fire Department's training division to see
how they ran their obstacle course test; and that he telephoned
the test's designer, University of Rhode Island professor Leo
O'Donnell, to get a copy of the test and find out how it should
be administered.

and then replace a roof ladder from the side of a fire engine;
(3) run 1 1/2 miles in 12 minutes;[4] and (4) throw the nozzle of a
1" booster hose over their shoulders and pull the hose 200' in 35
seconds.[5]  To make it to the third stage of the selection
process, applicants had to successfully complete the aerial
ladder climb and two of the agility test's three other
components.

The third stage was labelled the "obstacle course."  In
reality, the "obstacle course" consisted of three physical tests
and a written examination.  The three physical tests -- the
balance beam, a second hose pull and the actual obstacle course[6]

---

[4]At the preliminary injunction hearing, defendants' attorney
stated that the Department had made a "good faith error" in
requiring candidates to complete the run in 12 minutes.  Based on
the 1987 NFPA standards, the cutoff time "should have been ... 13
minutes."  Counsel admitted this mistake was a "detriment" to
Legault and other candidates.

[5]The hose was coiled on a reel attached to the back of a
fire engine.  This set-up was used solely to fight brush fires.

[6]For the balance beam, the department laid boards on the
ground, placed coffee cans on each end, and then had contestants
shuttle back and forth along the board, transfering a wooden
block from coffee can to coffee can.  In the hose pull event,
contestants had to grip a rope connected via pulley to a coil of
2 1/2" hose and pull the rope hand over hand, lifting the hose up
and down four times without letting go.  Finally, in the obstacle
course contestants had to climb through a window, crawl through a
corrugated tube, grab a 115 lb. dummy, haul it around a cone,

4

-- were time-graded by Department firefighters.  The written exam
was a standardized test administered by the Johnston Personnel
Department and graded by the out-of-state company from whom it
was purchased.  The results of the three tests and the written
examination were to be averaged and the contestants ranked
according to their score.[7]  The top twelve would then be chosen
to go on to the Johnston Fire Department Training Program.

B.    **The 1992 Recruitment Drive**

In late summer 1992, the Department advertised for
individuals to fill the eight newly-created positions.
Approximately one hundred and fifty individuals applied, twelve
of whom were women.  The first stage of the application process -
- the threshold EMT and BCI requirements -- narrowed the field to
fifty applicants.  Forty-six of these individuals, including
eleven women, then took the physical agility test.  The thirty
applicants that passed the test were all male.  These men then
went on to participate in the "obstacle course" stage of the

---

climb across a sawhorse-supported ladder and cross the finish
line.  Once they crossed the line, contestants had to double back
and repeat the course once more.

[7]The three tests were worth 60%, and the examination 40%.

selection process. Their scores on the three events and the written test were averaged and a final ranking calculated. The Chief then selected the top twelve contestants for the training program, which was set to begin on February 1, 1993.

Plaintiff was one of the female applicants who satisfied the Department's EMT and BCI requirements. She was thus allowed to participate in the agility testing. She took the test, completing the aerial ladder climb and the ladder removal/replacement drill. She also completed the run within thirteen minutes, and thus would have would have passed this requirement if it had been administered pursuant to the 1987 NFPA standards. However, like every other female participant, she did not meet the twelve minute standard that the Department mistakenly imposed. Like the other female candidates, she also failed the hose pull. As a result, plaintiff was eliminated from the process. She did not compete in the balance beam, second hose pull or obstacle course events. She also did not sit for the standardized examination.

## C. The Exceptions to the Testing Procedure

As outlined above, to be selected for the Department's training program, a candidate must have participated in all

6

phases of the selection process and have been one of the top twelve finishers. This "rule", however, soon was riddled with exceptions. After the testing had been completed, plaintiff learned that one woman, Susan Thibideau, had been selected for the training program without having participated in any of the tests.[8] Plaintiff then contacted her attorney, who faxed a letter to the Mayor calling his attention to Thibideau's selection for the program and complaining that plaintiff and other women had been discriminated against by the Department's testing procedures. The Mayor then promptly removed Thibideau from the list and replaced her with plaintiff and Melissa Murray, another woman who had been eliminated by the physical agility test. In doing so, the Mayor agreed in writing that "participation in the training program and class standing after the completion of the training program will determine placement on the hiring eligibility list for such vacancies as may open." Kenneth Moore, a "civilian" (i.e., non-firefighting) Department employee, was also added to the list without having participated in the testing procedures or having completed his EMT

---

[8]Thibideau had been placed on the program list by her EMT instructor, a captain in the Johnston Fire Department.

7

certification.

## D.    The Training Program

The 120-hour training program ran from February 1 to April 10, 1993.  Two nights a week, the recruits attended classes in subjects ranging from personal safety to forcible entry.  The trainees also spent several Saturday mornings doing "outside" work -- setting up ladders, laying hoses and familiarizing themselves with other firefighting equipment.[9]  The recruits were quizzed at the conclusion of each subject area and were also given a final exam.

Plaintiff was one of the top students in the program.  She attended every class.  She passed every quiz and passed the final exam.  She also participated in all of the outdoor events and, according to the instructor, "complete[d] all that was asked of

_____

[9]On one day, groups of trainees laid different types of hose lines for simulated fire attacks.  In doing so, they "got a feel for handling the charged hose lines and using the different size nozzles different ways".  On another day, the recruits raised and climbed different types of ground ladders.  Finally, the recruits also completed a "ladder evolution," a drill in which they laid field lines from a hydrant to a ladder truck, raised an aerial ladder that had a water pipe attached to it, coupled the field lines to the water pipe, and started the water flowing. According to the instructor, the ladder pipe gave off the Department's "largest stream."

8

her". At program's end, she stood second in her class. The other woman, Melissa Murray, placed first.

## E. Hiring

During the course of the program, the Department hired Moore, the male who had bypassed the supposedly mandatory testing procedures. After the program was completed, the Department again passed over plaintiff and Murray and hired three males who ranked lower in the class standings. When plaintiff complained, she was informed that the Chief had no knowledge of plaintiff's agreement with the Mayor. Instead, the Chief was hiring based on the trainees' standings after the "obstacle course" phase of the selection process.[10] Because plaintiff and Murray had not completed this phase, they were actually ranked fourteenth and fifteenth instead of first and second.

Plaintiff then asked the Mayor to honor their previous

---

[10]At the orientation meeting held before the first training class, the president of the firefighters' union told the trainees that "the training class grades had no bearing on their selection of getting on the fire department". Instead, the hiring order was dictated by the trainees' standing after the "obstacle course" phase. The union president said that these rankings would be used because he and the Chief felt that the training class should be a non-competitive, learning experience. Plaintiff did not attend the orientation meeting because she had not yet been allowed into the program.

agreement regarding the order of the hiring eligibility list. The Mayor, however, refused to do so. He stated that when he took it upon himself to include the "two girls" in the training program, and to hire them according to their class standing, he did so "with an understanding certainly that they had to pass all the other tests". According to the Mayor, "[w]e have men on the fire department that weigh 250 pounds;" although some women were undoubtedly qualified to be firefighters, the tests were necessary to ensure that the two women would not be a danger to themselves or the public. Moreover, when plaintiff called his attention to the fact that Moore was hired without having completed the tests, the Mayor responded that Moore was a "strong" man who had trained with the permanent men while he was a civilian Department employee. As plaintiff and Murray had not passed the tests, the Mayor refused to require the Department to hire them.

## F.    **Expert Testimony on the Validity of the Testing Procedures**

On May 25, 1993, plaintiff moved for a preliminary injunction barring defendants from appointing any person to the Johnston Fire Department except in accordance with the class standing in the recruit training program and requiring defendants

to hire her to fill one of the open positions.  A hearing was held before United States Magistrate Judge Barry on August 16, 1993.

At the hearing, plaintiff's expert, Norman Bedard,[11] opined that the testing procedure was "an invalid examination as a whole because many of its parts include things that are not appropriate for protected classes under the EEOC guidelines."  Bedard began by stating that the Department's firefighter job description/specification had not been reviewed for "a great many years", and that the consequence of developing a test around outdated job specifications was "the probability . . . that the test itself begins to fall because you're not using data that is validated" or otherwise professionally acceptable.

Bedard then proceeded to identify the test's specific failings.  Regarding stage one, he noted that there appeared to

---

[11]Bedard was a personnel management and labor relations consultant who had taught at several Rhode Island colleges and universities.  He had also served as a consultant to the United States Civil Service Commission, helping the CSC develop techniques for creating job-related tests and test-validating civil service examinations for a wide range of public occupations.  Under federal a grant, he also formed the New England Public Personnel Council to assist all public jurisdictions to develop similar techniques.  Among other positions, Bedard had also served as a special master in several Rhode Island District Court cases involving job-related testing.

be no criteria for determining who passed or failed the criminal record check. Regarding stage two, he determined (1) that the 1992 National Fire Protection Association standards contain no hose pull or run requirements; (2) that these two standards required strength not necessarily present in the average woman; and (3) that no women passed the physical agility test. Respecting stage three, Bedard cited the fact that the designer of the obstacle course unequivocally stated that it is not gender-neutral.[12]  Finally, Bedard pointed to two general factors indicating that the entire process was invalid -- that several individuals were excepted from the procedures (i.e., Thibideau, Moore, plaintiff, and Murray), and that, under Johnston's previous "call" system, women were not required to pass a physical agility test to serve as part-time

---

[12]In his deposition, O'Donnell stated that the test was not gender-neutral because it "puts a premium on physical abilities that tend to favor males, things like upper arm strength, strength and endurance, general endurance". O'Donnell contends, however, that his test is valid because it appears to both casual observers and professional firefighters that the test included the "kinds of things that firefighters have to do". He admitted that he had never determined whether a correlation actually existed between test performance and subsequent job performance.

12

firefighters.[13]

After the hearing, Magistrate Judge Barry issued a report recommending that I allow defendants to hire three new firefighters on August 13, 1993 and that plaintiff only be hired to fill the fourth position if she passes a physical strength and agility test administered pursuant to the 1992 NFPA guidelines. Plaintiff objects to Judge Barry's recommendation, asserting that his factual findings and legal conclusions were erroneous and that she is entitled to immediate instatement as an entry-level firefighter.[14]  I review the matter de novo.  Fed. R. Civ. P. 72(b); 28 U.S.C.A. § 636(b)(1)(C) (West 1993).

## II.  <u>DISCUSSION</u>

Legault's primary claim for relief rests on a "disparate impact" sexual discrimination theory.  <u>See</u> Civil Rights Act of

---

[13]Over the life of the call system, three women had served as call firefighters.  According to Mayor, they performed "admirably".  They performed the same tasks that permanent firefighters performed, and did so without taking a physical agility test.  Instead, their abilities were assessed during training and while they were on duty.

[14]Since Judge Barry's ruling, the Town has filled the three firefighting positions.  Plaintiff has also received right to sue letters from the U.S. Department of Justice and the State of Rhode Island Commission for Human Rights.

1991, Pub. L. 102-166, § 105(a), 42 U.S.C.A. § 2000e-2(k)(1)(A) (West 1993); Griggs v. Duke Power Co., 401 U.S. 424, 431 (1971). As I find that she is entitled to preliminary injunctive relief on this theory, I do not address her other claims. My analysis begins with the preliminary injunction standard recently reaffirmed by the First Circuit in Gately v. Massachusetts, 2 F.3d 1221, 1224-25 (1993).

## A.  The Preliminary Injunction Standard

In deciding whether to grant a preliminary injunction, a district court must consider four factors:

> (1) the likelihood of the movant's success on the merits; (2) the potential for irreparable harm to the movant; (3) a balancing of the relevant equities, i.e., the "hardship to the nonmovant if the restrainer issues as contrasted with the hardship to the movant if interim relief is withheld," Narragansett Indian Tribe v. Guilbert, 934 F.2d 4, 5 (1st Cir. 1991); and (4) the effect on the public interest of a grant or denial of the injunction.

Gately, 2 F.3d at 1224. Although each factor is significant, the "sine qua non of [the preliminary injunction standard] is whether the plaintiffs are likely to succeed on the merits." Id. at 1225 (quoting Weaver v. Henderson, 984 F.2d 11, 12 (1st Cir. 1993)) (brackets in original). Accordingly, I first analyze the merits of Legault's claim and then address the other three factors

14

seriatim.

1.   Likelihood of Success On the Merits

Legault claims that the Department's threshold agility test and three-part obstacle course test violate Title VII because they disproportionately exclude women from the Department's firefighter selection process.  She alleges that the agility test excluded all female applicants from the process, including herself, because its hose pull component required upper body strength not present in the average woman.  Although all female applicants were thereby precluded from taking the obstacle course test, Legault alleges that this test also places a similar emphasis on upper body strength, and thus has a gender-based disparate impact.  Based on the evidence presented thus far, I find that Legault will likely prevail on the merits of her disparate impact claim.

Under the "disparate impact" theory of employment discrimination, a facially neutral testing procedure violates Title VII if it disproportionately excludes female applicants from the hiring process and is not justified by business necessity.  See 42 U.S.C.A. § 2000e-2(k)(1)(A)(i);  Dothard v. Rawlinson, 433 U.S. 321, 329 (1977).  Proof in such cases is

15

governed by a series of shifting evidentiary burdens.  First, the plaintiff must establish a prima facie case by demonstrating that a particular testing procedure disproportionately excludes women. 42 U.S.C.A. § 2000e-2(k)(1)(A)(i);  Dothard, 433 U.S. at 329.  A showing of intentional discrimination is not required.  See id. at 328-29;  Watson v. Ft. Worth Bank & Trust, 487 U.S. 977, 986-87 (1988).  The burden then shifts to the employer to show that the procedure is "job related" and "consistent with business necessity."[15]  42 U.S.C.A. § 2000e-2(k)(1)(A)(i); see also Dothard, 433 U.S. at 329.  Even if the employer meets this burden, however, the plaintiff may still establish a Title VII violation by showing that the employer has refused to adopt a

---

[15]In Wards Cove Packing Co. v. Atonio, the Supreme Court held that, while the defendant carries the burden of producing evidence of a business justification, the burden of persuasion remains with the plaintiff.  490 U.S. 642, 659 (1989).  This holding was a marked departure from the Court's holdings in Griggs v. Duke Power Co., 401 U.S. 424 (1971), and several subsequent disparate impact cases, each of which placed the full burden of proving "business necessity" on the defendant.  Two years after Wards Cove, however, Congress responded by statutorily reversing the Court's decision to the extent it departed from the concept of business necessity enunciated in Griggs.  Civil Rights Act of 1991, Pub. L. 102-166, §(3)(2), 105 Stat. 1075 (1991); see also Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1117 & n.5 (11th Cir. 1993);  Frazier v. Garrison I.S.D., 980 F.2d 1514, 1525 & n.34 (5th Cir. 1993). As a result, the defendant once again bears the full burden of proving business necessity.

readily available, non-discriminatory alternative to the challenged practice.  <u>Albemarle Paper Company v. Moody</u>, 422 U.S. 405, 425 (1975).  42 U.S.C.A. §§ 2000e-2(k)(1)(A)(ii) & (C).

(a)  <u>Significant Disparate Impact</u>

Legault has shown that she is likely to succeed at trial in proving that the agility and obstacle course tests both have a significant disparate impact on women.  Regarding the threshold agility test, Legault has presented uncontradicted statistical evidence of a gender-based discrepancy:  30 of the 35 male candidates passed the test, whereas none of the 11 female candidates passed.  Whether the yardstick is intuition, the EEOC's "four-fifths rule", or some other measure, this discrepancy is "substantial" for Title VII purposes.  See <u>Fudge v. Providence Fire Dept.</u>, 766 F.2d 650, 657 (1st Cir. 1985) (judge justified in intuitively determining that discrepancy between 4% and 13% passing rates was substantial); EEOC Uniform Guidelines on Employee Selection Procedures, 29 C.F.R. §1607.4(D) (1993) (selection rate less than 4/5 (or 80%) of rate for group with highest passing rate regarded as evidence of adverse impact).

Admittedly, the sample size -- 46 applicants -- is small. See <u>Watson</u>, 487 U.S. at 996-97; <u>Fudge</u>, 766 F.2d at 657.  However,

17

by using Bedard's expert testimony to corroborate her statistical evidence, Legault has drastically reduced the possibility that the observed disparity is due to chance. At the preliminary injunction hearing, Bedard testified that the agility test's hose pull required upper body strength not present in the average woman. Consequently, he concluded that the test favored men. Defendants have had ample opportunity to present evidence contradicting this testimony, but have failed to do so. Having no reason not to accept Bedard's testimony, I find that Legault has shown that she is likely to succeed in proving that the hose pull component of the agility test is gender-biased. Moreover, I agree that this gender bias taints the test as a whole. See 42 U.S.C.A. § 2000e-2(k)(B)(i); 137 Cong. Rec. S15,276 (1991), reprinted at 1991 U.S.C.C.A.N. 767 (functionally-integrated components of same test may be analyzed as one employment practice).

With respect to the obstacle course test, Legault primarily relies on expert testimony to establish her prima facie case. The test's designer, Leo O'Donnell, admitted during his deposition that the test is not gender-neutral because it "puts a premium on physical abilities that tend to favor males, things like upper arm strength, strength and endurance, and general

18

endurance." Bedard also testified that several of the test's components (i.e., the second hose pull and the dummy-hauling portion of the obstacle course) required the same degree of upper body strength that caused all female applicants to fail the agility test's hose pull requirement. Based on the test's composition and O'Donnell's testimony, Bedard concluded that the obstacle course was gender-baised.

Although no female applicants were permitted to take the obstacle course test, its similarity to the agility test buttresses Bedard's conclusion that the obstacle course test also has a significant disparate impact on women. Given that the two tests are (1) closely related in form and function and (2) successive stages in a lock-step testing procedure, it is logical to conclude, based on the evidence produced at the preliminary injunction hearing, that the tests will have similar disparate impacts. See Davis v. City of Dallas, 748 F. Supp. 1165, 1173 (N.D. Tex. 1990) (similar hiring procedures that are subsequently validated may be used to validate prior hiring procedures). If employers in disparate impact cases were permitted to avoid injunctive relief simply by dividing a testing procedure into separate stages with similar discriminatory components, a plaintiff would be forced to brave several additional rounds of

19

litigation before she could obtain a hiring order.  I decline to impose such a requirement on Legault on the present record.

Obviously, given the above discussion, Legault has not made an exhaustive attempt to establish a prima facie case against either test.  However, defendants have highlighted no fallacies or deficiencies underlying Legault's case and and have presented no countervailing evidence.  Given that Legault has presented evidence which on its face demonstrates that the two tests have a substantial discriminatory effect, I find that Legault is likely to prove that defendants' agility and obstacle course tests have substantial, gender-based disparate impacts.  See Dothard, 433 U.S. at 331.

(b)  Business Necessity

Legault's prima facie showing shifts the burden to the defendants to demonstrate that its agility and obstacle course tests are "job related" and "consistent with business necessity." See 42 U.S.C.A. § 2000e-2(k)(1)(A)(i); Griggs, 401 U.S. at 432. There are three methods by which defendants can demonstrate that the tests meet this standard:

> [1] "empirical" or "criterion" validity (demonstrated
> by identifying criteria that indicate successful job
> performance and then correlating test scores and the
> criteria so identified); [2] "construct" validity
> (demonstrated by examinations structured to meansure

20

the degree to which job applicants have identifiable characteristics that have been determined to be important in successful job performance); and [3] "content" validity (demonstrated by tests whose content closely approximates tasks to be performed on the job by the applicant).

Washington v. Davis, 426 U.S. 229, 247 & n.13 (1976) (square brackets added); see also EEOC Uniform Guidelines on Employee Selection Procedures, 29 C.F.R. §§ 1607.5(A)-(B) (1993). Here, defendants argue that the tests' components have content validity because they resemble some firefighting tasks. I disagree.

At minimum, to demonstrate content validity an employer must show that its testing procedures accurately test important skills at a level commensurate with that legitimately required by the job. See Albemarle Paper Co., 422 U.S. at 431 (construing Griggs and 29 C.F.R. § 1607.4(c)); Boston Chapter NAACP, Inc. v. Beecher, 504 F.2d 1017, 1021-22 (1st Cir. 1974), cert. denied, sub nom Director of Civil Serv. v. Boston Chapter NAACP, Inc., 421 U.S. 910 (1975). This type of demonstration necessarily begins with a thorough job analysis in which the employer breaks the job down into its component tasks, breaks these tasks down into a set of component skills, and then determines the relative importance of these skills and the degree of proficiency required in each. Guardians Ass'n of New York City Police Dept. v. Civil

21

Serv. Com'n, 633 F.2d 232, 242 (2d Cir. 1980), aff'd, 463 U.S. 582 (1983) (quoting Vulcan Soc. of New York City Fire Dept. v. Civil Serv. Com'n, 360 F. Supp. 1265, 1274 (S.D.N.Y.), aff'd, 490 F.2d 387 (2d Cir. 1973)).  The employer must then demonstrate that its procedures accurately and reasonably test the skills identified in the job analysis in accordance with their relative importance.  See id. at 242-43.

Here, defendants' job analysis goes no farther than a several-year-old job specification that describes a firefighter's general duties.  The specification begins by stating that a firefighter's duties involve "the performance of hazardous tasks under emergency conditions" and "frequently requir[es] strenuous physical exertion".  It then goes on to provide examples of representative duties, including "driving and operating equipment and auppurtenances of heavy apparatus", "advancing fire hose into burning building" and "to cut, chop or break openings in roofs, floors, partitions and ceilings."  The specification does not break these representative tasks into their component skills, assess their relative importance, or indicate the degree of proficiency required for a firefighter to safely perform his or her duties.  The job specification's generality thus prevents it from being an adequate means of determing whether the agility and

obstacle course tests have content validity.  See, e.g., Vulcan Pioneers, Inc. v. New Jersey Dept. of Civil Serv., 832 F.2d 811, 815-16 (3d Cir. 1987); Jones v. New York City Human Resources Admin., 391 F. Supp. 1064, 1081 (S.D.N.Y. 1975), aff'd, 528 F.2d 696 (2d Cir.), cert. denied, 429 U.S. 825 (1976).

Given "the unlikelihood that an examination prepared without benefit of a probing job analysis will be content valid," the absence of such an analysis requires the examination's proponent to "carr[y] a greater burden of persuasion on the issue of job-relatedness." Guardians, 633 F.2d at 242-43.  However, rather than compensate for their lack of a proper job analysis by proffering evidence that the two tests have been thoroughly validated, defendants choose to rely on a few isolated bits of anecdotal evidence.  While "formal" validation studies are not necessary to satisfy the job-related/business necessity standard, Watson, 487 U.S. at 998, defendants' meager showing is grossly deficient.

First, Chief Zambarano defended the tests largely on the basis that they were similar to those used by four other Rhode Island cities.  However, Zambarano has presented no evidence indicating that these other cities have conducted proper job analyses or validation studies.  In this circumstance, follow the

23

leader is not an acceptable means of test validation.

Second, Zambarano also states that he consulted the relevant NFPA standards before deciding upon a final test format. Admittedly, the 1987 standards contain hose pull and timed run requirements. In 1989, however, the NFPA issued a proposed amendment indicating that all physical agility tests should be validated prior to use. Moreover, the August 1992 version deleted all preset physical ability requrements, stating that "[p]hysical fitness requirements for entry level personnel shall be developed and validated by" the relevant authorities, and "shall be in compliance with applicable Equal Opportunity regulations and other legal requirements."

Third, Leo O'Donnell, the obstacle course test's designer, stated that his test had content validity because it "appear[s] to be to the casual as well as the trained professional to be the kind of things that fire fighters have to do." O'Donnell, however, appears to base this conclusion on isolated answers to such randomly asked questions as "when was the last time you had to carry someone out of a building"? In addition, although O'Donnell stated that it would "clearly ... be a good idea" to validate his test, he admitted that "it was just something we didn't do."

24

Finally, the only other evidence supporting the two tests' content validity are Zambarano and Heywood's assertions that the tests "simulated things that we would normally come across in the fire service". In a similar situation, another court in this Circuit has stated that "such a substitution of instinct for hard proof is convenient, but totally lacking in legal merit." Burney v. City of Pawtucket, 559 F. Supp. 1089, 1101 (D.R.I. 1983) (Selya, J.). I agree.

Given that Legault has made a prima facie showing of substantial disparate impact and that defendants have failed to justify their two tests as "job related" and "consistent with business necessity", I conclude that there is a substantial likelihood that Legault will ultimately prevail on the merits of her claim. I now turn to the other three factors in the preliminary injunction standard.

### 2. Irreparable Harm

Legault claims that she will be irreparably harmed if the Department does not hire her immediately. She rests her claim on two grounds: (1) the Department may fill the available positions before her case is decided; and (2) even if a position were available after the trial and defendants were ordered to hire her

25

immediately, compensate her for lost wages and benefits, and adjust her seniority retroactively, the lost time on the job would result in a "career-long diminution of experience" that no court order could completely cure. While the case is a close one, I find the threat of irreparable harm sufficient to support Legault's request for preliminary injunctive relief.

In this Circuit, irreparable harm is subject to a "sliding scale analysis." Gately, 2 F.3d at 1232. At minimum, plaintiff must show that "adequate compensatory or other corrective relief will [not likely] be available at a later date, in the ordinary course of litigation ...." Sampson v. Murray, 415 U.S. 61, 90 (1974) (quoting Virginia Petroleum Jobbers Ass'n v. FPC, 259 F.2d 921, 925 (D.C. Cir. 1958)). The required showing increases, however, in the presence of factors "which cut against a court's traditional authority to issue equitable relief." Gately, 2 F.3d at 1232. These factors include a court's lack of statutory authority to issue the requested relief; the plaintiff's failure to exhaust applicable administrative remedies; and, in cases involving governmental employers, the "wide latitude traditionally granted the government in dispatching its own internal affairs." Id. at 1233-34 (quoting Sampson, 415 U.S. at 83). Additionally, where the relief sought includes interim

26

reinstatement or hiring, the plaintiff's showing of irreparable harm must also be sufficient to overcome the courts' traditional reluctance to command specific performance of personal service contracts.  Id. at 1234 (quoting Sampson, 415 U.S. at 83).

Legault is justifiably concerned that a lack of available positions may deprive her of immediate post-trial relief.  The Department has already filled at least six of the eight newly-created positions; given its agreement with the local firefighter's union, the Department is likely to fill the remaining positions prior to trial; under the Department's current ranking scheme, Legault will not be selected; and it may not be appropriate after the trial to require the Department to make room for Legault by firing a recent hire or by creating a new position.  By itself, however, this potential harm does not justify requiring the Department to hire her immediately.  I can protect her position simply by suspending further hiring until the merits of the case have been determined.

Legault's potential loss of valuable firefighting experience, however, requires stronger relief.  Firefighting is a skill learned on the job.  According to Captain Heywood, it "requires experience and the only way you get that is to actually do it."  This means more than fighting actual fires; at the

27

hearing, Chief Zambarano admitted that the Department's training sessions are also "valuable experience." Missed days thus are missed learning opportunities. These lost opportunities are also extremely difficult to recoup. Legault cannot schedule fires to occur more often on her shifts, nor can she require the other firefighters to endure the extra training sessions necessary to integrate her into a firefighting team and to bring her skills up to speed with their own. The result is an inevitable discrepancy between her seniority status, which can be retroactively adjusted, and her experience level, which cannot.

This discrepancy has serious consequences. It may impair her ability to take on responsiblities commensurate with her seniority. It may cause superiors to doubt her abilities and more experienced co-workers to resent her. While probably not the "career-long" injury that Legault claims -- after many years on the force, the practical importance of the missed time would necessarily dwindle -- this discrepancy would be an unavoidable disadvantage in her initial years on the job. I hold that this is irreparable harm sufficient to satisfy Gately's minimum requirements. See Gately, 2 F.3d at 1234 (plaintiff police officers irreparably harmed by time away from job as their ability to keep in touch with new development were impaired).

28

Given that there are no factors cutting against my authority to issue the requested relief, see id. at 1233-34,[16] the present facts require no greater showing.

### 3. Balancing of the Equities

As a counterweight to Legault's showing of irreparable harm, defendants claim that she will be a danger to herself, to the other firefighters and to the public if she is hired without taking the Department's physical agility and obstacle course tests. Defendants, however, have presented no evidence to substantiate this claim. As I indicate in Section II.B., infra, I reject defendants' contention that Legault is not otherwise qualified for the job. For the same reasons, I reject any attempt by defendants to assert this contention here. I

---

[16]First, Title VII explicitly authorizes court-ordered hiring. See 42 U.S.C.A. §2000e-5(g)(1) (West 1993). Second, having received right-to-sue letters from both the U.S. Department of Justice and the State of Rhode Island Commission for Human Rights, Legault has exhausted available administrative remedies. See Bailey v. Delta Air Lines, Inc., 722 F.2d 942, 944 (1st Cir. 1983). Third, the need to ensure defendants' compliance with Title VII and the need to protect Legault's statutory rights more than overcome any reluctance I might have to issue this type of relief. Finally, while hiring Legault might interfere with the Town's ability to conduct its internal affairs, this interference is hardly substantial enough to act as an independent constraint on the court's equitable powers.

29

therefore conclude that Legault's showing of irreparable harm clearly outweighs any potential harm that her hiring will cause defendants.

4. The Public Interest

Finally, Legault's request for injunctive relief requires that the public's substantial interest in eradicating sexual discrimination be balanced against its interest in the safety of its firefighters and the people they serve. After weighing the likelihood that defendants' testing procedures violate Title VII, see Section II.A.1., supra, against my finding that defendants have done nothing to support their claim that Legault poses a risk to public safety if she is hired as a firefighter, see Sections II.B., infra, I conclude that the public interest favors issuance of the requested relief.

B. The Requested Relief

Where a plaintiff has likely been denied employment based on sex, federal courts have the equitable power both to ensure that defendants comply with the law pending a determination of the merits and to order any interim compensatory relief necessary to prevent the plaintiff from suffering irreparable harm. See

<u>Albemarle Paper Co.</u>, 422 U.S. at 417-18; <u>Sinai v. New England Tel. & Tel. Co.</u>, 3 F.3d 471, 476 (1st Cir. 1993). However, an employer may nevertheless shield itself from a hiring order in an individual disparate impact case if it can establish that the plaintiff is unqualified for the position she seeks. <u>See</u> <u>Franks v. Bowman Transportation Co.</u>, 424 U.S. 747, 772 (1976).[17] Here, defendants argue that Legault lacked the physical abilities necessary to safely and effectively perform her duties as an entry-level firefighter; that, as a result, she would not have been hired, irrespective of the testing procedures' disparate impact; that she therefore was not injured by these procedures; and that consequently, she is not entitled to a hiring order.

---

[17]Although <u>Franks</u> is a class action case where a "pattern or practice" of discrimination was alleged, defendants have offered no reason why a different burden of proof would apply in individual disparate impact cases. <u>See</u> <u>Teamsters v. United States</u>, 431 U.S. 324, 367-71 (1977) (in pattern or practice case, defendant has the burden of proving that individual plaintiffs were unqualified for positions); 42 U.S.C.A. §2000e-5(g)(2)(B) (West 1993) (in disparate treatment case, if defendant can demonstrate that it would have taken the same action in the absence of the impermissable movtivating factor, it may avoid back pay and injunctive relief but not declaratory relief and attorney's fees); <u>East Texas Motor Freight Sys., Inc. v. Rodriquez</u>, 431 U.S. 395, 400, 402, 403 n.9 (1977) (in class action attacking facially neutral employment practice, defendant entitled to avoid damages by demonstrating that individual plaintiffs were not qualified and would not have been hired in any event).

While it is unclear whether a "clear or convincing" or "preponderance of the evidence" standard should apply, see Price Waterhouse v. Hopkins, 490 U.S. 228, 253-54 (1989), I give defendants the benefit of the doubt and judge their claims against the lesser standard. Even under this standard, however, defendants have failed to show that they will likely carry their burden at trial.

It is apparent from the record that defendants have made virtually no effort to support their claims beyond expending the energy to assert them. First, they have not attempted to evaluate Legault's physical qualifications beyond the results of her participation in the Department's testing procedures and training program. Consequently, the only evidence that reflects negatively on Legault's abilties are the facts that she failed a discriminatory component of the agility test and that she was not allowed to take the equally discriminatory obstacle course test. Rather than showing that Legault is unqualified, this evidence helps to establish her prima facie case.

Moreover, while firefighting undoubtedly requires physical ability, defendants' attempts to identify and quantify these requirements go no further than the woefully inadequate job description and anecdotal validation attempts detailed in Section

32

II.A.1(b), <u>supra</u>. As a result, even if defendants had provided some evidence that reflected negatively on Legault's abilities, I would be unable to determine whether this evidence established that she was not qualified to be a firefighter.

Finally, although Mayor aRusso eloquently expressed his concerns for public safety, his attempt to invoke these concerns to prevent Legault's instatement are suspect at best. He agreed in writing that "participation in the training program and class standing after the completion of the training program will determine placement on the hiring eligibility list for such vacancies as may open." Only after Legault's performance in the training program had guaranteed her a position did he decide that she had to "pass all the other tests" before she would be hired. In addition, defendants had previously hired several individuals as firefighters, including women, without their having passed a physical ability test or participating in a training program. In these instances, defendants ensured everyone's safety by supervising the untested individuals, assessing their abilities and then increasing their responsiblities as these abilities developed. Given that Legault has already gone through several physical tests and the Department's training program, there is no

reason why the same cannot be done here.[18]

In sharp contrast to the defendants' ineffective presentation, plaintiff has proffered considerable evidence affirmatively indicating that she is qualified to be an entry-level firefighter: she filled out the application form, hold's a valid driver's license and is EMT-certified by the state of Rhode Island; she passed the aerial ladder climb and the ladder replacement drill outright; although she failed to complete the timed run within the required twelve minutes, she satisfied the thirteen minute standard that defendants admit they should have used; and finally, she placed second overall in the Department's training program, which included physical testing as well as classroom work. The upshot of these facts is that Legault satisfied every non-discriminatory requirement administered by defendants.

Based on the evidence presented thus far, I find that defendants will likely fail to establish that Legault lacks the physical abilities to be a safe and effective firefighter. Accordingly, she is entitled to instatement as an entry-level

_____

[18]If Legault is not physically able to carry out her duties, defendants can move that I reconsider my order. At this point, however, the evidence points in the opposite direction.

firefighter pending determination of the merits of this case. Because I am confronted with a likely Title VII violation, I also have a duty to go beyond the preliminary relief requested and ensure defendants' interim compliance with the law. <u>Guardians Ass'n of New York City Police Dept. v. Civil Serv. Com'n</u>, 630 F.2d 79, 108 (2d Cir. 1980), <u>cert. denied</u>, 452 U.S. 940 (1981). Therefore, pending determination of the merits of this case, I enjoin further use of the tests and any eligibility lists derived therefrom.

## III.  <u>CONCLUSION</u>

For the foregoing reasons, I grant Legault's request for a preliminary injunction and order defendants to hire her immediately pending a determination of the merits. Subject to the exceptions outlined in Section II.B., <u>supra</u>, and pending a determination of the merits, I also enjoin further use of defendants' agility and obstacle course tests and any eligibility lists derived therefrom.

To ensure that the merits of this case are determined as quicky as possible, I will hold a scheduling conference at 9:30 a.m. on February 22, 1994. At the conference, the parties shall

be prepared to identify the earliest possible date they will be ready for trial.

     SO ORDERED.


                              _____
                              Paul Barbadoro
                              United States District Judge

February 10, 1994

cc:   Thomas A. DiLuglio, Esq.
      Henry Spaloss, Esq.
      Ina P. Schiff, Esq.