Carriage Hill v. Hayden, et al.        CV-96-101-SD   07/03/96

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE

Carriage Hill Health Care, Inc.

                v.                          Civil No. 96-101-SD

Christopher Hayden and
Benco Dental Supply Co.


## REPORT AND RECOMMENDATION


        Currently before the court is Plaintiff Carriage Hill Health

Care, Inc.'s ("Carriage Hill") motion for a preliminary

injunction.  For the reasons set forth below, Carriage Hill's

motion is granted in part and denied in part.


                        BACKGROUND

    Carriage Hill commenced this action by filing a complaint on

February 20, 1996, alleging breach of contract and interference

with contractual relations.  The parties are before the court

based on their diversity of citizenship and because the alleged

amount in controversy exceeds $50,000.  See 28 U.S.C. § 1332.

Defendants countered that Carriage Hill also breached its

contract with defendant Christopher Hayden ("Hayden"), committed

abuse of process by initiating this action, sought to unlawfully

restrain trade and also tortiously interfered with contractual

relations. On March 1, 1996, Carriage Hill moved for a preliminary injunction, to which defendants objected on April 26, 1996. A hearing was held over two days, on May 14 and 29, 1996. The facts ascertained from the evidence proffered in support of each party's motion regarding the preliminary injunction follow.

Carriage Hill is a small, fairly new, dental supply company in the New Hampshire and southern Maine seacoast area. It distributes products from manufacturers, or suppliers, to dentists and other health care workers. As a result, Carriage Hill's relationships with both suppliers and purchasers are important to its business success. In addition to its president, Lorin Gill ("Gill"), Carriage Hill currently has two full-time employees and one independent contractor. Hayden had been a salesman with Carriage Hill from June, 1992 until he left the company on February 9, 1996 to go to work for defendant Benco Dental Supply Company ("Benco"). As of the hearing, Hayden had not yet been replaced.

Benco, on the other hand, is a large, established dental supplies distributer with over 600 employees in approximately 14 states. Benco had been doing business in Maine and New Hampshire for three to four years before Hayden began working for it. Benco describes itself as a "one stop convenience shop" for dentists, enabling them to purchase an array of products needed

in their offices. In addition to selling products, Benco organizes continuing education seminars and training programs for dental assistants and hygienists. It also services its customers' equipment and designs "programs" for dentists.

Gill described Hayden as an aggressive, hard-working employee whom Gill trusted and to whom Gill gave free access to the business and its files. While working for Carriage Hill, Hayden had not signed any written employment contract, restrictive covenant or any other nondisclosure agreement. His duties included principally calling on dentists and placing orders, although he was involved in some purchasing and related tasks. He attended sales and industry conferences and had meetings with vendors and customers.

The facts surrounding Hayden's departure from Carriage Hill to Benco can be summarized briefly as follows. Sometime in 1995, Hayden became dissatisfied with his compensation and had lost his medical insurance coverage after becoming married. He was offered Carriage Hill stock in response. Then in early January, 1996, Gill informed Hayden that reimbursement for his business expenses would be restricted in an effort to enhance the company's profitability.

Immediately thereafter, Hayden contacted and met Benco's regional sales director Stephen Hoyt ("Hoyt"), to inquire about

3

employment opportunities with Benco. Although Hayden's initial meeting with Hoyt was not on Carriage Hill time, he did meet with Hoyt and other Benco officials at an annual dental convention in late January, where he was representing Carriage Hill. After that interview, Hayden was offered and accepted a job with Benco. As part of a signing bonus, Hayden executed a non-compete agreement.

On February 9, 1996, Hayden submitted a written resignation to Gill, at which time he offered to stay on for two weeks provided Gill could meet Benco's compensation package. Gill declined to do so, and the two agreed Hayden would come in the following Monday to finalize miscellaneous business and administrative matters. Although Gill was surprised at Hayden's departure, they parted on seemingly good terms with Gill wishing Hayden good luck.

Thereafter the relationship deteriorated rapidly. The evidence adduced indicated that Hayden may have used his key to Carriage Hill's office to enter the building over the weekend and remove certain customer files and vendor lists, although Hayden denied this. Hayden failed to come in that Monday, as agreed. When he called Gill, Gill instructed Hayden to return Carriage Hill's customer lists and his vendor slot lists, and informed Hayden that if he used these "trade secrets" to take unfair

4

advantage of Carriage Hill he would be sued.  Gill determined that Hayden had taken Carriage Hill's pricing catalogue and the key to the office with him as well.  Rather than returning these items to Carriage Hill, Hayden gave them to his attorney.

The missing customer lists, vendor lists and pricing catalogue are the basis for this dispute.  Gill testified that this information is confidential information "quite valuable as a reference" to it.  The customer list is a list of Carriage Hill's actual customers indicating the customer's buying and payment histories.  The vendor slot list indicates when Carriage Hill could call on various customers and was developed only after the salesperson had invested significant time with the corresponding office.  Much of this data is also on Hayden's personal computer. The missing pricing catalogue contains information available only to Carriage Hill employees regarding discount calculations for various products.  Carriage Hill alleges that Hayden is using these various sources of information on Benco's behalf to undercut its prices and unfairly take business away from it.

Benco, however, maintains its own customer and pricing databases which also reflect buying and payment histories of customers.  Hoyt testified that he asked Hayden for none of Carriage Hill's customers, pricing, product or vendor information.  Hoyt explained that Benco's larger size put it in a

5

different league from Carriage Hill and that it was not interested in competing with Carriage Hill. The evidence also demonstrated that since Hayden began working with Benco, he has been in sales training, often outside his market area of southern Maine and part of New Hampshire.

Gill testified that since Hayden's departure Carriage Hill has lost business which he estimated to aggregate $30,000 annually, based on the 1995 sales to those customers which have been lost since Hayden's departure. Gill also testified that Carriage Hill has lost alot of good will to Benco. Gill also admitted, however, that other dental supply companies compete in the same market and that he does not know what percentage of Carriage Hill's business is being lost to other suppliers. Carriage Hill seeks an injunction to prevent Hayden from calling on its customers in Maine and New Hampshire.

DISCUSSION

"The purpose of a preliminary injunction is to preserve the status quo, freezing an existing situation so as to permit the trial court, upon full adjudication of the case's merits, more effectively to remedy discerned wrongs." CMM Cable Rep., Inc. v. Ocean Coast Properties, Inc., 48 F.3d 618, 620 (1st Cir. 1995) (citing Chalk v. United States Dist. Court Cent. Dist. of

6

California, 840 F.2d 701, 704 (9th Cir. 1988); American Hosp. Ass'n v. Harris, 625 F.2d 1328, 1330 (7th Cir. 1980)).

In determining whether to grant a preliminary injunction, the court considers four factors. Legault v. aRusso, 842 F. Supp. 1479, 1485 (D.N.H. 1994). The four factors are: "(1) the likelihood of the movant's success on the merits; (2) the potential for irreparable harm to the movant; (3) a balancing of the relevant equities, i.e., the `hardship to the nonmovant if the restrainer issues as contrasted with the hardship to the movant if interim relief is withheld,' Narragansett Indian Tribe v. Guilbert, 934 F.2d 4, 5 (1st Cir. 1991); and (4) the effect on the public interest of a grant or denial of the injunction." Id. (quoting Gately v. Massachusetts, 2 F.3d 1221, 1224 (1st Cir. 1993); see also Campbell Soup Co. v. Giles, 47 F.3d 467, 470 (1st Cir. 1995); Sunshine Development, Inc. v. F.D.I.C., 33 F.3d 106, 110 (1st Cir. 1994); Aoude v. Mobil Oil Corp., 862 F.2d 890, 892 (1st Cir. 1988). Although each of these factors is significant, the sine qua non of the preliminary injunction standard is whether the movant is likely to succeed on the merits. Legault, 842 F. Supp. at 1485. Given that the likelihood of the movant's success is the essential element of the quadripartite test, the court starts with a consideration of this component. Weaver v. Henderson, 984 F.2d 11, 12 (1st Cir. 1993); Lancor v. Lebanon

7

<u>Housing Authority</u>, 760 F.2d 361, 362 (1st Cir. 1985).

1.  <u>Likelihood of Success on the Merits</u>.

Carriage Hill contends that defendants actions have (1) breached an implied covenant of good faith, and (2) tortiously interfered with its contractual relations with its customers and two suppliers.  The second claim is actually two counts, one each against Hayden and against Benco for their respective intentional and improper interference with Carriage Hill's business relationships.  Based on the evidence proffered in support of the requested preliminary injunction, the court concludes that Carriage Hill is unlikely to succeed on either claim.

First, breach of the implied covenant of good faith is inapposite to Hayden's decision to leave Carriage Hill and go to work for a competitor.  In this diversity action, the substantive law of New Hampshire controls.  <u>Fragoso v. Lopez</u>, 991 F.2d 878, 886 (1st Cir. 1993) (citing <u>Erie R.R. Co. v. Tompkins</u>, 304 U.S. 64, 78 (1938)); <u>K.J. Quinn & Co. v. Continental Casualty</u>, 806 F. Supp. 1037, 1040 (D.N.H. 1992).  New Hampshire law recognizes an implied duty to exercise good faith in the performance of contractual obligations in three distinct categories of contract cases:  (1) "those dealing with standards of conduct in contract formation," (2) "with termination of at-will employment

8

contracts," and (3) "with limits on discretion in contractual performance." Centronics Corp. v. Genicom Corp., 132 N.H. 133, 139, 562 A.2d 187 (1989). Carriage Hill's cause of action based on an alleged breach of the implied covenant of good faith claims: "Hayden knew this confidential proprietary information about Carriage Hill was confidential yet he willfully disclosed it to Benco breaching his agreement with Carriage Hill to act in good faith." This allegation most closely approaches the third category of cases in which a good faith duty has been implied in the discretionary performance of a contract.

The good faith duty recognized in the discretionary performance of a contract is the duty "to provide the level of services consistent with good faith . . . to vindicate . . . the parties' reasonable expectations." Id. at 141 (discussing New Hampshire's seminal case on the implied obligation of good faith performance, Griswold v. Heat Corp., 108 N.H. 119, 229 A.2d 183 (1967)).

> [T]he obligation of good faith performance is better understood simply as excluding behavior inconsistent with common standards of decency, fairness, and reasonableness, and with the parties' agreed-upon common purposes and justified expectations.

Id. at 140 (citing authority). The duty arises, however, only where a contractual duty to perform lies. See id. at 141-143 (discussing cases finding a good faith duty to reasonably

9

perform).

Here, Hayden was not bound by an employment contract when the complained-of activity allegedly occurred. First, Carriage Hill asserts that Hayden contacted its customers and suppliers on behalf of Benco while still employed by Carriage Hill; however, neither the testimony adduced at the hearing nor the exhibits proffered in support of the preliminary injunction motion substantiate that allegation. Instead, Gill testified that Hayden had been a good employee and that they parted amicably. Cf. Ferrofluidics Corp. v. Advanced Vacuum Components, Inc., 789 F. Supp. 1201, 1211-12 (D.N.H.), aff'd, 968 F.2d 1463 (1st Cir. 1992) (enjoining former employee who aggressively set up competitive company while on company time). Second, the evidence suggested that, to the extent Hayden pursued those business relationships, it was after he had resigned from Carriage Hill. At that point, he was not bound by even the at-will, oral agreement previously governing his conduct and arguably giving rise to an implied good faith duty to perform. See Centronics Corp., 132 N.H. at 143 (recognizing the parties' intent to be bound by an enforceable contract gives rise to an implied obligation of good faith performance). Third, there was not a restrictive covenant, non-compete agreement or any form of nondisclosure agreement binding Hayden's activities after leaving

10

Carriage Hill's employ from which an obligation of good faith performance could be implied. Id.; cf. Ferrofluidics Corp., 789 F. Supp. at 1210-12 (enforcing a restrictive covenant to protect former employer's goodwill and confidential proprietary technology); Technical Aid Corp. v. Allen, 134 N.H. 1, 9-10, 13, 591 A.2d 262 (1992) (enforcing a restrictive covenant where narrowly drawn to protect plaintiff's proprietary interest in customer lists and marketing information whose value former employee learned of while employed by plaintiff); Allied Adjustment Serv. v. Heney 125 N.H. 698, 701, 484 A.2d 1189 (1984) (finding a covenant not to compete reasonable where it protected former employer's goodwill).

Carriage Hill asserts that it has lost customers, reputation, good will, income and opportunities for increased sales because of Hayden's move to Benco with its "trade secrets" in hand. Yet despite this allegation, Carriage Hill did not bring a cause of action for misappropriation of its trade secrets. See N.H. Rev. Stat. Ann. ("RSA") 350-B:1, I, II and IV (defining misappropriation of a trade secret); see also Fisher Stoves, Inc. v. All Nighter Stove Works, Inc., 626 F.2d 193, 196 (1st Cir. 1980) (requiring plaintiff to prove its customer list was truly secret before protecting it as a trade secret). Without an extant contract, there is no basis for "an implied

11

obligation of good faith to observe reasonable limits in exercising [a party's] discretion, consistent with the parties' purpose or purposes in contracting." Centronics Corp. 133 N.H. at 143.

Carriage Hill's second and third counts assert Hayden and Benco tortiously interfered with its contractual relations with both its customers and two suppliers, Tilloston and MGIS. In order to prove a cause of action for tortious interference with contractual relations, Carriage Hill must establish:

> (1) it had an economic relationship with a third party;
>
> (2) defendants knew of that relationship;
>
> (3) defendants intentionally and improperly interfered with that relationship; and
>
> (4) it was damaged by such interference.

Solanti v. Smith, 812 F. Supp. 1280, 1296 (D.N.H. 1993) (citing Jay Edwards, Inc. v. Baker, 130 N.H. 41, 46, 534 A.2d 706 (1987) (emphasis in original) (quoting Emery v. Merrimack Valley Wood Products, Inc., 701 F.2d 985, 988 (1st Cir. 1983))).

Under New Hampshire law, "economic relationship" is construed as a contractual relationship. See Solanti, 812 F. Supp. at 1297 (explaining that plaintiff's employment contract established the economic relationship); see also Roberts v. General Motors Corp., 138 N.H. 532, 539, 643 A.2d 956 (1994)

12

(requiring plaintiff show that he had a contractual relationship with which defendant wrongfully interfered). Even where plaintiff alleges tortious interference with a prospective agreement, the plaintiff must prove he had a contractual relationship with the third party. See Montrone v. Maxfield, 122 N.H. 724, 726, 449 A.2d 1216 (1982) (citing authority). "To establish that the defendant's conduct was improper, the plaintiff had to `show that the interference with his contractual relations was either desired by the [defendant] or known by him to be a substantially certain result of his conduct.'" Demetracopoulos v. Wilson, 138 N.H. 371, 374, 640 A.2d 279 (1994) (citing Restatement (Second) of Torts, § 767 comment d at 32 (1977)) (emphasis added).

Carriage Hill's tortious interference claim is unlikely to succeed because it did not have an ongoing contractual relationship with its customers or its two critical suppliers with which defendants improperly interfered. There was no evidence to support Carriage Hill's allegation that Benco, through Hayden, tried to take Carriage Hill's place with either of its major suppliers. With respect to its customers, Carriage Hill stipulated that "one does not own dentists," and Gill conceded that Carriage Hill did not have any "ownership interest" in its business relationship with its customers. See Transcript

13

of Preliminary Injunction Hearing on May 14, 1995 ("Vol. 1") at 43. Gill also testified that the dentists were "barraged on an almost daily basis by sales reps" from many companies. Id. Gill even described the relationship as one of "courting" the dental offices. "Courting" is not a contractual relationship, and implies something much more facile than the type of valid business relationship undergirding a tortious interference claim. See Curtis 1000, Inc. v. H. Suess, 843 F. Supp. 441, 451 (C.D. Ill. 1994) (recognizing that something less than an enforceable contract may support a tortious interference claim under Illinois law).

The evidence showed that in fact the dental supply business is remarkably competitive, with at least three large suppliers and 25 small distributors in the New England region alone. The testimony was consistent that sales representatives of these multiple players compete vigorously, which explained why Carriage Hill deemed its "vendor slot list" so valuable. Carriage Hill wants to protect its customer, vendor and pricing data precisely because it wants a competitive advantage in order to obtain sales contracts. Without the requisite "economic relationship," Carriage Hill is unlikely to succeed on its tortious interference with contractual relations counts. See Solanti, 812 F. Supp. at 1296 (setting forth the elements necessary to plead successfully

14

a tortious interference cause of action).

Accordingly, the court finds that Carriage Hill has not satisfied the first prerequisite to the issuance of a preliminary injunction, namely its likelihood of success on the merits. See Legault, 842 F. Supp. at 1485 (holding that likelihood of success on the merits is the indispensable requisite for preliminary injunctive relief).

2. Other Factors.

Because the court has determined that Carriage Hill is unlikely to succeed on the merits of any one of its three counts, further analysis of the requirements for a preliminary injunction is unnecessary. See id.; see also Weaver v. Henderson, 984 F.2d 11, 12, 14 (1st Cir. 1993) (affirming denial of preliminary injunction and ending inquiry after reviewing the merits of plaintiff's claims); Performance Unlimited, Inc. v. Questar Publishers, Inc., 52 F.3d 1373, 1381 (6th Cir. 1995) ("A district court is required to make specific findings concerning each of the four factors, unless fewer are dispositive of the issue." (quotation omitted)). The court notes, however, that Gill's testimony that Carriage Hill will suffer approximately $30,000.00 in damages from lost sales seriously undermines a claim of irreparable harm. See id. at 1382 (defining an irreparable injury as one which cannot be undone through monetary remedies);

15

see also Hughes Network Sys. v. Interdigital Communications Corp., 17 F.3d 691, 694 (4th Cir. 1994) (refusing to find irreparable harm where the harm suffered may be compensated by an award of damages); but see Ferrofluidics, 789 F. Supp. at 1212 (enforcing restrictive covenant because of uncertainty associated with the loss of income caused by defendant's breach). The public interest factor also weighs heavily against effectively construing a restrictive covenant where none exists. See Centors-Vacuum Indus., Inc. v. Lavoie, 135 N.H. 651, 654, 609 A.2d 1213 (1992) (citing New Hampshire authority for the long-standing view disfavoring contracts in restraint of trade). Accordingly, the court concludes that a preliminary injunction is not warranted under the circumstances presented here.

CONCLUSION

The court has carefully considered the parties' legal arguments, the testimony by the witnesses, and the various exhibits submitted in support of the pending motion for preliminary injunction (document no. 2). The court concludes, however, that Carriage Hill has not made the requisite showing to justify preliminary injunctive relief. Accordingly, the court recommends that Carriage Hill's motion seeking to enjoin both Hayden and Benco from competing with it be denied. The court

16

recommends granting Carriage Hill's motion with respect to return of the property listed in paragraph B therein and currently held by defense counsel, since Hayden admitted it is plaintiff's property to which it is entitled. The court recommends denying all other grounds for relief, because they would be more appropriately addressed in a discovery pleading.

Any objections to this report and recommendation must be filed within ten days of receipt of this notice. Failure to file objections within the specified time waives the right to appeal the district court's order. See <u>Unauthorized Practice of Law Committee v. Gordon</u>, 979 F.2d 11, 13-14 (1st Cir. 1992); <u>United States v. Valencia-Copete</u>, 792 F.2d 4, 6 (1st Cir. 1986).

_____
James R. Muirhead
United States Magistrate Judge

Date:   July 3, 1996

cc:     Donald E. Mitchell, Esq.
        Francis X. Quinn, Esq

17